UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SELWYN KARP, Individually and On Behalf of All Others Similarly Situated, | )<br>)<br>) Case No. |
| Plaintiff, | )<br>) |
| v. | ) <u>CLASS ACTION COMPLAINT</u><br>) |
| DIEBOLD NIXDORF, INCORPORATED, ANDREAS W. MATTES, and CHRISTOPHER A. CHAPMAN, | ) <u>JURY TRIAL DEMANDED</u><br>)<br>)<br>) |
| Defendants. | ) |

Plaintiff Selwyn Karp ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Diebold Nixdorf, Incorporated ("Diebold" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Diebold securities between May 4, 2017 and July 4, 2017, both dates inclusive (the "Class Period"), seeking to recover

damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Diebold was founded in 1859 and is incorporated under the laws of the state of Ohio.  In 2016, the Company changed its name from Diebold to Diebold Nixdorf, following the transformational acquisition of Wincor Nixdorf Aktiengesellschaft (now known as Diebold Nixdorf AG).  As a result of the acquisition, the Company has significantly increased its presence around the world and now conducts business in more than 130 countries.

3.     Diebold provides connected commerce services, software and technology to enable millions of transactions each day.  The Company's approximately 25,000 employees purportedly design and deliver convenient, "always on" and highly secure solutions that bridge the physical and the digital worlds of transactions.  The Company's three reportable operating segments are services, software and systems.

4.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company was experiencing delays in systems rollouts as well as a longer customer decision-making process and order-to-revenue conversion cycle; (ii) the foregoing issues were negatively impacting the Company's services business and operations; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.     On July 5, 2017, Diebold disclosed that the Company expected a wider net loss than indicated in its prior guidance for fiscal 2017, from a range of $50 to $75 million to a range of $110 to $125 million net loss.  The Company attributed the lowered expectations to a delay in

systems rollouts as well as a longer customer decision-making process and order-to-revenue conversion cycle.

6.      Following this news, Diebold's stock price fell $6.40 per share, or nearly 23%, to close at $21.60 per share on July 5, 2017.

7.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

10.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Diebold's common stock trades on the New York Stock Exchange ("NYSE"), located within this Judicial District.

11.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

12.     Plaintiff, as set forth in the attached Certification, acquired Diebold's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13.     Defendant Diebold is incorporated under the laws of Ohio with its principal executive offices located at 5995 Mayfair Road, PO Box 3077, North Canton, Ohio.  Diebold's common stock trades in an efficient market on NYSE under the symbol "DBD."

14.     Defendant Andreas W. Mattes ("Mattes") has served as Diebold's President and Chief Executive Officer ("CEO") at all relevant times.

15.     Defendant Christopher A. Chapman ("Chapman") has served as Diebold's Senior Vice President and Chief Financial Officer ("CFO") at all relevant times.

16.     Defendants Mattes and Chapman are collectively referred to hereinafter as the "Individual Defendants."

17.     The Individual Defendants possessed the power and authority to control the contents of Diebold's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

18.     Diebold was founded in 1859 and is incorporated under the laws of the state of Ohio.  In 2016, the Company changed its name from Diebold to Diebold Nixdorf, following the transformational acquisition of Wincor Nixdorf Aktiengesellschaft (now known as Diebold Nixdorf AG).  As a result of the acquisition, the Company has significantly increased its presence around the world and now conducts business in more than 130 countries.

19.     Diebold provides connected commerce services, software and technology to enable millions of transactions each day.  The Company's approximately 25,000 employees purportedly design and deliver convenient, "always on" and highly secure solutions that bridge the physical and the digital worlds of transactions.  Customers of the Company include nearly all of the world's top 100 financial institutions and a majority of the top twenty-five global retailers. The Company's three reportable operating segments are services, software and systems.

### Materially False and Misleading Statements Issued During the Class Period

20.     The Class Period begins on May 4, 2017, when Diebold filed its quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarterly period ended March 31, 2017 (the "1Q 2017 10-Q").  For the quarter, the Company reported losses of $58.8 million, or $0.78 per diluted share, on revenue of $1.1 billion, compared to net income of $168.2 million, or $2.56 per diluted share, on revenue of $509.6 million for the same quarter in 2016.  Additionally, the Company reported net sales and cost of sales attributable to Diebold's systems segment of $419.2 million and $354.8 million, respectively, as compared to $168.5 million and $139.9 million, respectively, for the same quarter in 2016.  With regard to net

sales and cost of sales attributable to Diebold's services and software segments,[1] the Company reported $683.6 million and $505.5 million, respectively, compared to $341.1 million and $230.9 million, respectively, for the same quarter in 2016.  Finally, the Company reported assets in customer relationships, net, for the quarter of $587.5 million as compared to $596.3 million in the same quarter for 2016.

21.    While failing to mention any issues related to delays in Diebold's systems rollouts, the 1Q 2017 10-Q touted the automation, optimization, and efficiency of Diebold's systems line of business ("LOB").  Specifically, the 1Q 2017 10-Q stated, in relevant part:

*Systems LOB*
The Company is a global leader in providing systems to banks, retailers and other customers. Through collaboration with its customers, engineering excellence and an efficient supply chain, the Company delivers industry-leading customer touchpoints which process both physical and digital transactions. The Systems LOB seeks to optimize the total cost of ownership by maximizing transaction availability and creating a positive impression on consumers.

The systems portfolio for banking customers consists of cash recyclers and dispensers, intelligent deposit terminals, teller automation tools, and physical security devices. Recent innovation concepts include the miniaturized Extreme ATM and Essence. Extreme ATM is the smallest ATM ever developed at less than 10" wide, which allows customers to stage transactions on mobile phones and complete them using Bluetooth® devices or near-field communication. Essence is a highly-secure and miniaturized ATM that features a sleek, antimicrobial glass touchscreen display and enhanced user interface modeled after today's smartphones and tablet computers.

For retail customers, the checkout portfolio includes modular, integrated and mobile POS systems that meet evolving automation and omni-channel requirements of consumers. Supplementing the POS system is a broad range of peripherals, including printers, scales and mobile scanners, as well as the cash management portfolio which offers a wide range of banknote and coin processing systems. Also in the portfolio, the Company provides self-checkout terminals and ordering kiosks which facilitate an efficient and user-friendly purchasing experience. The Company's hybrid product line can alternate from attended

---

[1] The 1Q 2017 10-Q does not list services and software (although separate operating segments for reporting purposes) as two separate figures in its balance sheet under net sales and cost of sales, and only provides a separate figure for its systems segment.

operation to self-checkout by the cashier with the press of a button as traffic conditions warrant throughout the business day.

22.     Additionally, the 1Q 2017 10-Q highlighted the purported operating efficiencies that Diebold's systems LOB had initiated, including:  "leveraging the purchasing power of the Company through a new procurement partnership program"; "streamlining the product portfolio - including terminals, core technologies and components"; "developing a partner ecosystem to complement the Company's core technologies"; "consolidating manufacturing capacity to optimize fixed costs"; and "re-allocating R&D spend to areas of innovation."

23.     Similarly to its systems LOB section, the 1Q 2017 10-Q touted the functionality of Diebold's services LOB while again failing to mention any issues related to delays in the Company's systems rollouts.  Specifically, the 1Q 2017 10-Q stated, in relevant part:

*Services LOB*
With approximately 14,500 highly-trained service employees and a global delivery network, Diebold Nixdorf is the global leader in servicing distributed IT assets of banking and retail customers. These services enable customers to meet the growing demand for transaction availability at ATMs, POS and other distributed IT assets in a cost-effective manner. Diebold Nixdorf's global customer care center offers round-the-clock availability and is proficient in supporting customers in more than 25 languages. The global service supply chain optimizes the process for obtaining replacement parts, making repairs, and implementing new features and functionality. The Company also possesses deep experience in installing, maintaining and upgrading customer touchpoints manufactured by other vendors, also known as multi-vendor support.

Product-related services provided by the Company include proactive monitoring and rapid resolution of incidents through remote service capabilities or an on-site visit. First and second line maintenance, preventive maintenance and on-demand services keep the distributed assets of the Company's customers up and running through a standardized incident management process. Managed services and outsourcing consists of the end-to-end business processes, solution management, upgrades and transaction processing. The majority of these contracts include remote monitoring and establish a service level threshold for uptime, incident response times and other key performance metrics. Diebold Nixdorf provides managed solutions in order for banks and retailers to realize operational efficiencies and gain access to industry-leading innovations.

The Company also provides a full array of cash management services, which optimizes the availability and cost of physical currency across the enterprise through efficient forecasting, inventory and replenishment processes. These services mitigate customer risks by relying on proven monitoring and reporting processes, secure tools and partnerships with larger cash-in-transit companies.

24.     The 1Q 2017 10-Q also touted Diebold's so-called "DN2020" program, which Defendants described as "a multi-year integration and transformation program . . . which aligns employee activities with the Company's goal of improving operating profit by $200 in the year 2020."  According to the 1Q 2017 10-Q, "[b]y executing the program, the Company expect[ed] to deliver greater innovation for customers, career enrichment opportunities for employees, and enhanced value for shareholders."  Specifically, the 1Q 2017 10-Q lauded DN2020's beneficial impact on Diebold's systems LOB, while again failing to disclose an issue with delays in systems rollouts:

> DN2020 empowers the Systems LOB to align the portfolio with market demand, deliver innovations and increase operating efficiencies on innovation and efficiency. With respect to innovation, the Company will continue to spend significant research and development dollars on the latest technology. Current areas of innovations include:
> - mobile technologies to support advanced connectivity including contactless transactions,
> -  new sensors and the Internet of Things to support real-time monitoring activities,
> - miniaturization technologies needed for branch/store transformation, and
> - advanced security capabilities including anti-skimming card readers and biometric authentication.

25.     In discussing Diebold's systems revenue, the 1Q 2017 10-Q noted several headwinds, none of which included a delay in the Company's systems rollouts.  Specifically, the 1Q 2017 10-Q stated, in pertinent part (with related figures in millions, except per share amounts):

> Systems revenue increased $250.7 or 148.8 percent and included a net favorable currency impact of $1.9. The three month time period of 2017 also included an unfavorable impact of $5.2 related to purchase accounting adjustments. The

increase in systems revenue was due to incremental revenue associated with the Acquisition of $276.7, which consisted of $135.5 from banking and $141.2 from retail. Excluding the impact of the [Wincor Nixdorf Aktiengesellschaft] Acquisition and currency, systems banking revenue decreased $29.9 as a result of a large project in Switzerland in the prior year period that did not recur as well as lower distributor sales. In Asia Pacific, lower volume in China due to decreased demand, a decrease in security sales in India and lower volume in the Philippines, also contributed to the decline. Additionally, digital pin pad sales were lower due to non-recurring business in the current period.

26.     Similarly, in discussing Diebold's services revenue, the 1Q 2017 10-Q again noted several headwinds, none of which included a delay in the Company's systems rollouts. Specifically, the 1Q 2017 10-Q stated, in pertinent part (with related figures in millions, except per share amounts):

> Services revenue increased $254.5 or 79.9 percent and included a net favorable currency impact of $3.7. The three months ended March 31, 2017 also included an unfavorable impact of $5.2 related to purchase accounting adjustments. The overall increase in services revenue was due to incremental revenue associated with the [Wincor Nixdorf Aktiengesellschaft] Acquisition of $262.8, which consisted of banking $163.3 and retail $99.5. Excluding the impact of the Acquisition and currency, services banking revenue decreased $13.5 primarily due to a large NA project in the prior year period that did not recur and in China due to price erosion and lower parts sales. These decreases were partially offset by higher billed work revenue in NA associated with a large project and increased service maintenance revenue in Latin America driven by volume increases primarily in Colombia.

27.     The 1Q 2017 10-Q also lauded the flexibility Diebold offered its customers in terms of selecting from a combination of its systems, services, and software.  This indicated greater decision-making power in the Company's customers as they selected from a diverse array of Diebold products and services, while omitting how Diebold's customer decision-making process had actually lengthened.  For example, the 1Q 2017 10-Q stated, in relevant part:

> Leveraging the broad portfolio from each LOB, the Company allows customers the flexibility to select the combination of services, software and systems that drives the most value to their business. For example, the Company offers end-to-end branch and store automation solutions that consist of the complete value chain of consult, design, build and operate.

28.     Similarly, the 1Q 2017 10-Q assured investors that "[t]he Company's advisory services team collaborates with its clients to define the ideal customer experience, modify processes, refine existing staffing models and deploy technologies that meet business objectives[,]" which presumably helped optimize Diebold's customer relationships and sales.

29.     With regard to order-to-revenue conversion cycles, the 1Q 2017 10-Q merely noted that, generally, "the amount of cash flow provided or used by the aggregate of trade accounts payable, inventories and trade accounts receivable depends upon how effectively the Company manages the cash conversion cycle[.]"  According to the 1Q 2017 10-Q, the cash conversion cycle "represent[ed] the number of days that elapse from the day it pays for the purchase of raw materials and components to the collection of cash from its customers[,]" and that this could be "significantly impacted by the timing of collections and payments in a period." However, the 1Q 2017 10-Q failed to mention that Diebold was facing issues with the order-to-revenue component of its conversion cycle, and further failed to differentiate this conversion cycle from its other conversion cycles, thereby making it more difficult to gauge the health of that particular component.  Worse, the 1Q 2017 10-Q failed to even mention Diebold's order-to-revenue cycle, a factor so presumably important to the health of the Company that Diebold would later attribute it to a significantly wider net loss in its guidance for the entire year.

30.     Appended as exhibits to the 1Q 2017 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein the Individual Defendants certified that "[t]he [1Q 2017 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934[,]" and that "[t]he information contained in the [1Q 2017 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the [1Q 2017 10-Q]."

31.     On the same day, in connection with filing the 1Q 2017 10-Q, Diebold issued a press release announcing the Company's first quarter 2017 results (the "1Q 2017 Press Release").  The 1Q 2017 Press Release reported full year 2017 guidance for Diebold, which projected a net loss attributable to the Company of $50 to $75 million.

32.     Defendant Mattes, as quoted in the 1Q 2017 Press Release, celebrated Diebold's DN2020 program, improved systems orders, backlog, and improved customer relationships, stating:

> The transition to Diebold Nixdorf is complete; now, we truly begin our long-term transformation with the DN2020 program we launched during the quarter . . . . From a market perspective, I'm especially encouraged by the solid sequential growth in systems orders and backlog we generated during the period. This is a good indication that our sales engine is gearing up after the breaking-in period of our new company in the second half of last year . . . . In addition, the large, multi-year contract renewals we recently announced with our two largest outsourcing customers are a testament to our strong competitive position and a confirmation of our services-led, software-enabled strategy. They also point to the importance our customers place on effectively managing the enduring nature of cash usage, which is a key value we bring to the market.

33.     The 1Q 2017 Press Release also touted, *inter alia*, "[s]ignificant outsourcing renewals with TD Bank and Hamburger Sparkasse (Haspa) for nearly 6,000 automated teller machines"; a "[n]ew outsourcing contract with a Spanish retailer encompassing retail IT equipment in 1,000 locations"; a [b]ranch automation project with Banco Santander in Mexico, including 1,200 ATMs and cash recycling units"; that Diebold had "[w]on [a] three-year services contract for 8,000 ATMs and other IT equipment with the largest private bank in Brazil"; "[c]onnected commerce solutions enabled for consumers of Ziraat Bank, the largest financial institution in Turkey, with advanced software and professional services for 7,000 ATMs"; "[m]omentum building for cash recycling systems and software, with new wins for 5,000 units in Asia and Eastern Europe"; that the Company had "[w]on [a] contract for 1,000 self-checkout

systems and four years of service with COOP stores in Switzerland;" and that the Company was "[d]riving new innovations in miniaturization with the Extreme self-checkout and Essence ATM concepts[.]"

34. The statements referenced in ¶¶ 20-34 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company was experiencing delays in systems rollouts as well as a longer customer decision-making process and order-to-revenue conversion cycle; (ii) the foregoing issues were negatively impacting the Company's services business and operations; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Begins to Emerge

35. On July 5, 2017, Diebold issued a press release titled "Diebold Nixdorf Adjusts 2017 Financial Outlook" (the "July 2017 Press Release"). The July 2017 Press Release disclosed that the Company expected a wider net loss than indicated in its prior guidance for fiscal 2017, from a range of $50 to $75 million to a range of $110 to $125 million net loss.

36. Diebold attributed the lowered expectations to a delay in systems rollouts as well as a longer customer decision-making process and order-to-revenue conversion cycle. Specifically, the July 2017 Press Release stated, in relevant part:

> As previously disclosed, the company's banking business is increasingly made up of large, complex projects with higher software content, resulting in a longer customer decision-making process and order-to-revenue conversion cycle. As a result, the timing and volume of orders to date leads the company to adjust its 2017 guidance.
>
> In addition, the delay in systems rollouts also has a negative impact on the company's service business. This change in volume, combined with investments

in hiring and training in the service organization as part of the company's transformation, will pressure near-term margins.

37.     Following this news, Diebold's stock price fell $6.40 per share, or nearly 23%, to close at $21.60 per share on July 5, 2017.

38.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

39.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Diebold securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.   Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

40.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Diebold securities were actively traded on the NYSE.   While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by Diebold or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

41.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

42.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

43.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Diebold;

- whether the Individual Defendants caused Diebold to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Diebold securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

44.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

45.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Diebold  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Diebold securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

46.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

47.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

48.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

49.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

50.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Diebold securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Diebold securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

51.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to

16

influence the market for Diebold securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Diebold's finances and business prospects.

52.     By virtue of their positions at Diebold, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

53.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Diebold, the Individual Defendants had knowledge of the details of Diebold's internal affairs.

54.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Diebold.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Diebold's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements,

the market price of Diebold securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Diebold's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Diebold securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

55.     During the Class Period, Diebold securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Diebold securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Diebold securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Diebold securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

56.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

57.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases,

acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

58.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

59.     During the Class Period, the Individual Defendants participated in the operation and management of Diebold, and conducted and participated, directly and indirectly, in the conduct of Diebold's business affairs.  Because of their senior positions, they knew the adverse non-public information about Diebold's misstatement of income and expenses and false financial statements.

60.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Diebold's financial condition and results of operations, and to correct promptly any public statements issued by Diebold which had become materially false or misleading.

61.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Diebold disseminated in the marketplace during the Class Period concerning Diebold's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Diebold to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of Diebold within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they

participated in the unlawful conduct alleged which artificially inflated the market price of Diebold securities.

62.     Each of the Individual Defendants, therefore, acted as a controlling person of Diebold.  By reason of their senior management positions and/or being directors of Diebold, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Diebold to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Diebold and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

63.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Diebold.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  July 2, 2019

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
Jonathan Lindenfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: ahood@pomlaw.com
Email: jlindenfeld@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

***Attorneys for Plaintiff***

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.   I, Selwyn Karp, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.   I have reviewed a Complaint against Diebold Nixdorf, Inc. ("Diebold" or the "Company"), and authorize the filing of a comparable complaint on my behalf.

3.   I did not purchase or acquire Diebold securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Diebold securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.   To the best of my current knowledge, the attached sheet lists all of my transactions in Diebold securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.



8.   I declare under penalty of perjury that the foregoing is true and correct.

Executed _____ July, 1, 2019
         (Date)

         (Signature)

Selwyn Karp
(Type or Print Name)

**Diebold Nixdorf, Incorporated (DBD)**                                                **Karp, Selwyn**

## List of Purchases and Sales

| Date | Purchase or Sale | Number of Shares/Unit | Price Per Share/Unit |
|------|------------------|-----------------------|----------------------|
| 6/12/2017 | Purchase | 2,000 | $26.9840 |