UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | x | |
| In re DIEBOLD NIXDORF, INC. SECURITIES LITIGATION | : : : | Civil Action No. 1:19-cv-06180-LAP CLASS ACTION |
| This Document Relates To: | : : : | |
| ALL ACTIONS. | : : x | DEMAND FOR JURY TRIAL |

CONSOLIDATED COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

4813-7945-3360.v4

**TABLE OF CONTENTS**

**Page**

SUMMARY OF THE ACTION ....................................................................................1

    Background to the Class Period .......................................................................1

    The Class Period .............................................................................................6

    Post-Class Period Events ...............................................................................11

JURISDICTION AND VENUE ...............................................................................13

PARTIES ..................................................................................................................14

    Lead Plaintiff ................................................................................................14

    Defendants ....................................................................................................14

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND
    OMISSIONS ..................................................................................................16

    Fourth Quarter and Full-Year 2016 Earnings Release and Conference Call; 2017
        Investor Day Conference ...............................................................16

    First Quarter 2017 Earnings Release and Conference Call, and JP Morgan Tech,
        Media and Telecom Conference .........................................................30

    Second Quarter 2017 Earnings Release and Conference Call; Lowered Financial
        Outlook ...........................................................................................38

    Third Quarter 2017 Earnings Release and Conference Call ...............................47

    Defendant Mattes Is Terminated for Failing to Execute Strategy and Drive Results........53

    Fourth Quarter and Full-Year 2017 Earnings Release and Conference Call....................54

    The Truth About Defendants' False and  Misleading Statements Begins to
        Emerge;  Diebold Abandons Its DN2020 Program ...............................63

ADDITIONAL INDICIA OF DEFENDANTS' SCIENTER ........................................71

    Defendants Were Intimately Knowledgeable About the Integration and Merger
        Synergies, and in Control of the Business Prospects and Sales Efforts as
        Integration Proceeded .....................................................................72

    The Fraud Alleged Herein Relates to Diebold's Core Business.......................75

**Page**

The Abandonment of Diebold's DN2020 Program  and Subsequent Write-Down of Approximately $200  Million in Merger-Related Goodwill Evidences Defendants' Knowing or Reckless Misconduct ................................................... 76

Defendants' Fraudulent Conduct Allowed Them to Retain Their Executive Positions and Collect Millions  in Compensation and Bonus Awards ................. 77

Defendants Mattes's, Chapman's and Wunram's Certifications Pursuant to §302 of the Sarbanes-Oxley Act Further Demonstrate They Acted with the Requisite Level of Scienter ................................................................................ 78

There Is a Strong Inference that Diebold Acted with the Requisite Scienter ................... 79

LOSS CAUSATION/ECONOMIC LOSS ........................................................... 80

CLASS ACTION ALLEGATIONS ........................................................... 82

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ........................................................... 84

NO SAFE HARBOR EXISTS FOR DEFENDANTS' STATEMENTS ..................................... 86

COUNT I ........................................................................................... 87

COUNT II ........................................................................................... 91

PRAYER FOR RELIEF ........................................................................... 92

JURY DEMAND ........................................................................... 92

4813-7945-3360.v4

Lead Plaintiff Indiana Laborers Pension and Welfare Funds ("Plaintiff" or "Indiana Laborers"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Diebold Nixdorf, Incorporated's ("Diebold" or the "Company") press releases and U.S. Securities and Exchange Commission ("SEC") filings, and analyst reports, media reports and other publicly disclosed reports and information about the Company, as well as interviews with former Diebold employees.  Plaintiff believes that substantial additional evidentiary support exists and will provide further support for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.       This is a securities class action on behalf of all purchasers of Diebold securities from February 14, 2017 to August 1, 2018, inclusive (the "Class Period"), against Diebold and certain of the Company's former executive officers (together, "Defendants") seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.       Defendant Diebold is an international financial and retail technology company that focuses on the sale, manufacture, installation, and service of self-service transaction systems (such as ATMs and currency processing systems), point-of-sale terminals, physical security products, and software and related services.

**Background to the Class Period**

3.       In 2013, Diebold's legacy business was struggling to drive meaningful revenue growth or profitability.  At the same time, the Company's compliance program, internal accounting controls, record-keeping, and financial reporting policies and procedures were placed under the

scrutiny of an independent compliance monitor pursuant to a settlement with the SEC and the U.S. Department of Justice related to charged violations of the Exchange Act and the Foreign Corrupt Practices Act.[1]   In the midst of these investigations and poor financial results, the Company implemented restructuring programs that resulted in the appointment of defendant Andreas ("Andy") W. Mattes ("Mattes") to the position of Chief Executive Officer ("CEO") in July 2013.

4.      Defendant Mattes, a former tech executive at Hewlett-Packard and Siemens, had been hired to transform Diebold into a "services-led, software enabled company."  In furtherance of these efforts, in March 2015, Diebold purchased the Canadian software company, Phoenix Interactive Design ("Phoenix"), which was intended to be the "backbone" of this services-led transformation. The goal, according to Mattes, was to "'shoot for the stars'" for 70% of Diebold's revenue to come from the Company's more profitable services and software segment while reducing the percentage of revenue coming from the less profitable hardware segment, but said he "knew it was going to be a turnaround job."

5.      Following completion of the Phoenix acquisition to bolster the Company's software business, rumors began circulating in June 2015 that Diebold had contacted one of its primary competitors, Germany's Wincor Nixdorf AG ("Wincor Nixdorf"), about a possible acquisition. Wincor itself had been struggling with declining sales and profits, including slowing hardware sales, and was reportedly considering a potential sale.  In October 2015, the two companies entered into a non-binding term sheet agreement on the "key parameters of a potential strategic business combination."  On November 23, 2015, Diebold entered into a business combination agreement (the "Merger Agreement") with Wincor Nixdorf to merge under the name "Diebold Nixdorf."  Once completed, it would be the largest acquisition in Diebold's history.

---

[1]      The independent corporate monitorship expired on October 29, 2016.

4813-7945-3360.v4

6.      At the time, the acquisition was viewed as a means to stave off the threat posed by cashless transactions, and enhance margins through its transition to a more profitable services-led revenue model, by creating the largest ATM manufacturer in the world with a dominant market share of over 30%.  As Mattes described the deal, "by leveraging innovative solutions and talent from both organizations we will have the scale, strength and flexibility to help our customers through their own business transformation" and create a new global powerhouse "well positioned for growth in high-value services and software . . . across a broader customer base."  The companies seemingly had complementary geographic concentrations and the deal promised to provide access to a deep roster of customers across Eurasia and the Americas.  The acquisition would also purportedly allow Diebold to grow its software and services offerings in order to retain its competitive edge, even as the world economy continued to shift to cashless transactions.

7.      According to Mattes, the companies underwent "a very lengthy diligence process" prior to entering into the Merger Agreement, and would "*fit extremely well together . . . nearly like two pieces of a jigsaw puzzle*" to create "*$160 million in annual cost savings*."  Mattes stated:

>        We are very excited about the combination with Wincor Nixdorf as we continue to see tremendous upside in this deal.  The customer feedback we're receiving is very positive.  The near-term growth opportunities in our industry are happening in the developed markets.  This combination gives us fighting weight in those markets on both sides of the Atlantic so the timing couldn't be better.  It's a great opportunity for our customers, for both companies, and their respective shareholders.

8.      Defendants touted their pre-merger work for the integration by highlighting their previous experience in similar circumstances, the detailed pre-integration work to ensure the merger would generate the promised synergies, and their visibility and control over the risks in their integration.  For example, in response to an analyst question concerning the "what types of pre-integration work, if there is any, is in progress with Wincor that you are performing right now,"

Mattes explained the "the collaborative spirit in which we did the business combination agreement has even grown to new heights and the planning teams are working very well together." Furthermore, he added:

> [W]e have two solid teams on both sides who spend solid amounts of time on how we are going to run the business, what's the business model, where are we going to go, what are the potential synergy areas – **making sure that when we hit the day X +1 we know exactly who is going to do what, who's going to take care of which account, what's the product road map, where are the low hanging fruits and how can we reach those synergies sooner and faster**. And while I'm not at liberty to disclose clean room information, I can tell you the spirit in these rooms – and I'm only allowed to be in there for certain pieces of information – but every time I leave the meeting, I leave more excited than when I walked into the room. **It's a great atmosphere and we're getting so much work done that I know we will hit the deck running on day X +1**.

9.      To facilitate the merger, Diebold conducted a public tender offer pursuant to which it acquired a majority of Wincor Nixdorf shares for €38.98 in cash plus 0.434 Diebold common shares for each Wincor Nixdorf share ("legacy shares"). Although the majority of Wincor Nixdorf shares were tendered at the time of the merger, approximately 22% of the legacy shares were not redeemed, and legacy shareholders retained the right to redeem them for cash in the future at a value of roughly $400 million. The consideration paid for Wincor Nixdorf was ultimately valued at $1.8 billion and Diebold took on more than $2 billion in debt to finance the acquisition, which closed in August 2016.

10.     To finance the Wincor Nixdorf transaction, Diebold entered into certain credit agreements with JPMorgan Chase Bank, N.A. and Credit Suisse AG (the "Banks") for approximately $2.3 billion in senior secured term loans and unsecured notes. In addition, Diebold expected to raise an additional $0.5 billion in the form of a senior secured revolver, for a total of $2.8 billion in financing. The credit agreement between Diebold and the Banks required, amongst other things, that the Company could not exceed a total net leverage ratio (the "debt ratio") of 4.5 to

- 4 -

1.0 at the end of any quarter, and was required to reduce the Company's debt ratio to 4.25 by year end 2017, to 4.00 by year end 2018, and to 3.75 by June 30, 2019.

11.     The Company was also required to promptly notify the Banks in writing of any default or other developments which could reasonably be expected to have a "Material Adverse Effect" on "(i) the business, Property, operations or condition (financial or otherwise) of the Company and its Subsidiaries taken as a whole, (ii) the ability of the Borrowers and Guarantors, taken as a whole, to pay the Obligations under the Loan Documents, or (iii) the validity or enforceability of any of the Loan Documents or the rights or remedies of the Administrative Agent or the Lenders thereunder."  A default by Diebold could result in the debt becoming "immediately due and payable."

12.     Diebold assured investors that it was working on a plan for the integration of the two companies, and following execution of the term sheet, defendant Mattes claimed he already had 90% visibility into the committed synergies.  Mattes assured analysts and investors that there were:

> [V]ery good systems and processes in place, and we will take a very unbiased best-of-breed approach between both companies, and we will pick what we like best on either side, irrespective of whether it is a legacy Diebold or legacy Wincor process, and *we will go to the most streamlined, most cost efficient process, that will give us the biggest synergies and leverage going forward*.

13.     By July 2016, Mattes was confidentially touting the progress of the merger and integration planning, stating:

> Over the past few months, teams from both companies have been diligently developing integration plans and we are confident that we will hit the ground running.  The excitement is definitely building as we prepare to double the size of our Company.
>
> We are eager to begin the integration of our two companies and together offer our customers the broadest solution set in the industry.

14.     And defendant Christopher A. Chapman ("Chapman"), Diebold's Chief Financial Officer ("CFO"), confirmed that any enterprise resource planning ("ERP") issues were behind them: "The bug[s] and the kinks in the system, we worked through those in Q1 [2016]."  Two weeks later, on August 15, 2016, the merger was completed.

**The Class Period**

15.     Beginning on February 14, 2017, and continuing thereafter throughout the Class Period, defendants Mattes, Chapman, and Wunram touted the merger with Wincor Nixdorf and praised the progress of the integration.  During Diebold's February 14, 2017 conference call with investors and analysts to discuss the Company's fourth quarter and full-year 2016 results and outlook, Mattes discussed the merger and stated that Diebold "continue[d] to make progress" on integration, touted the positive effects of the integration, and explained that "[f]or the first time, the sales team is *fully aligned* around our goals, quotas, and account plans."  Mattes assured investors: "We have made *extensive changes to realign our sales organization*, to be closer to our consumers, and we are investing in training, so our sales executives can be even better consultants to our customers on their digital journey.  *These actions represent the foundation of our new sales excellence program*, which you will be hearing more about in the near future."

16.     Defendant Chapman echoed these statements in his remarks to investors, stating:

> *The teams are working very diligently on integration activities and driving cost synergies.  The cost benefits will flow more substantially through the P&L as we progress in the year*.  As a result, we anticipate about one-third of our adjusted EBITDA to be realized in the first half of the year, based on our current scheduled backlog and sequencing of our synergy realization.

17.     Indeed, in response to an analyst question concerning issues the Company experienced in the EMEA region in late 2016, defendant Mattes assured investors that these initial

- 6 -

sales integration issues were "*all . . . in the rear-view mirror.  Everybody is aligned*."  In fact, Mattes later emphasized again: "*[W]e've got everybody on the same goal sheet*.

18.     Thereafter, in a February 28, 2017 press release, Defendants continued to tout the benefits the Company would receive through the execution of its "multi-year business integration and cost-savings program, named DN2020."  The DN2020 "integration roadmap" targeted an increased "net cost improvement target of $200 million" by 2020 and a revenue target of "approximately $5.5 billion."  According to Diebold:

> The plan will align the company's employees around executing common strategies and goals linked to six key areas over the next three years:
>
> - Further developing the company's strategy and Connected Commerce[;]
> - Achieving *financial excellence*;
> - Continued *success in integration*;
> - Implementing *operational excellence* around services, manufacturing and supply chain;
> - Building a *performance-based culture* while continuing to attract and retain talent;
> - Establishing *sales excellence*.

19.     According to the Company's SEC Form 10-K filing, DN2020 was "*designed to optimize . . . assets, business processes, and IT systems*" of the merged companies and "enhance[] value for shareholders."

20.     A few days later, at Diebold's February 28, 2017 Investor Day Conference, defendant Juergen Wunram ("Wunram") claimed that "*IT will be a big enabler for synergy capture*," explaining that the Company's "dual ERP strategy" of using Diebold's legacy ERP system in the Americas, and Wincor's legacy ERP system in Europe and Asia Pacific would create "*speed and takes out a lot of risks*" of rolling out a new system.

21.     Meanwhile, defendant Mattes assured investors that Defendants were integrating the companies with "*eyes wide opened*," while defendant Wunram stated his confidence in the integration activities, going so far as to suggest that the integration targets might not be "aspirational

- 7 -

enough," explaining: "*We are not naive*.  I think *all of us have in one or the other way been in similar situations*, in M&A situations and in merger or integration activities.  So, *we are aware of the risks*."  Mattes also discussed the positive effects the merger and integration would have on the Company's sales and revenue, explaining that Defendants would make sure that the Company was realizing the touted "sales excellence across the whole system" because "come April, the whole company is going to be on one sales management tool, we're using Salesforce all around the globe, *so we know exactly who's doing what, where*.  Is our sales team truly embracing the broadened portfolio of the company that we have?  But more importantly, *since January, everybody is on the same goal sheets*."[2]

22.     In the months that followed, Diebold and its senior executives repeatedly claimed that integration efforts were meeting or exceeding expectations.  For example, defendant Mattes stated that he had "*confidence*" that Diebold "*should be able to exceed [its] cost synergy targets for the year*."  Diebold executives also repeatedly reaffirmed the Company's 2017 financial guidance.  As late as May 22, 2017, Mattes stated that "*everybody is singing off the same hymn sheet*" in successfully executing sales targets as a combined business.  He represented that Diebold was achieving "*operational excellence*," "*financial excellence*," and "*sales excellence*" and confirmed that *the Company would "[a]bsolutely" experience "very, very strong earnings growth year-on-year as [Diebold] go[es] into 2018*."

23.     Unbeknownst to the investing public, but known to and concealed by the Individual Defendants, the touted success of the merger and integration was not as Defendants were portraying

---

[2]     "Salesforce is a customer relationship management solution that brings companies and customers together.  It's one integrated CRM ["customer relationship management"] platform that gives all your departments – including marketing, sales, commerce, and service – a single, shared view of every customer."  *What is Salesforce?*  Salesforce, https://www.salesforce.com/products/what-is-salesforce/# (last visited Jan. 9, 2020).

it to be, and cracks began to show.  In fact, Diebold was suffering from massive inefficiencies created by the merger, which had in fact materially ***worsened*** the Company's competitive position as executives struggled with the task of combining two distinct organizational cultures and operational hierarchies.  As a result, Diebold had missed significant sales opportunities, was ceding market share to competitors, had failed to successfully integrate the two legacy sales forces, was suffering from an impaired supply chain, had failed to integrate or remove complexity from the disparate IT and inventory systems, and was experiencing tens of millions of dollars in integration cost overruns.

24.     On July 5, 2017, the Company shocked the market when it announced that it would miss its financial outlook for 2017 by $200-$300 million, lowering guidance to between $4.7 and $4.8 billion, down from $5.0 billion.  And two weeks later defendant Chapman would concede that Diebold had "underestimated the amount of distractions tied to the integration, the amount of change that we introduced into the organization and also the size of the hole that we dug ourselves as we exited '16 and came into '17."  But Defendants offset the negative news by falsely touting that they had "made good progress on integrating the field service organization, which includes unifying the legacy IT systems and logistics support," and by increasing expected net savings from the merger synergies by an additional $40 million, to $240 million by the end of 2020.  Yet, defendants Mattes, Chapman and Wunram knew and concealed that these cost savings were generated by activities that were adversely impacting the Company's ability to generate the sales and revenue necessary to justify the merger and meet even its downward-revised revenue outlook.

25.     Then, in December 2017, Diebold announced that Mattes had been asked to leave due to Diebold's poor financial performance following the merger with Wincor Nixdorf. Notwithstanding, Defendants still failed to disclose the truth of the failed integration efforts and the

- 9 -

resulting adverse effects such efforts had and were continuing to have on the Company's sales and financial results.

26.     Then, on May 2, 2018, Diebold announced disappointing first quarter 2018 financial results and suspended its dividend in an attempt to improve its liquidity and debt position, mere weeks after the Company amended its credit agreement with the Banks to increase its debt ratio. Gerrard Schmid ("Schmid"), Diebold's new CEO, admitted that – contrary to Defendants' prior representations – *Diebold had been rendered too "complex" by the integration* of Wincor Nixdorf, and attributed much of the Company's problems on previously undisclosed issues created by the merger, such as "*a number of inconsistent processes* in different regions, which are exacerbated by a *complex IT environment*."

27.     Analysts, shocked that Diebold was *still dealing with "the complexity, the inefficiency, the overburden, the IT systems use manual workarounds*" questioned Schmid: "[W]hat needs to be done here, because the company has thrown tens of millions, if not even $100 million plus.  They're trying to fix this massive – this IT problem.  And I guess, *I'm a little surprised to hear it's still this big of a problem*."  Noting the "*additional complexity in [the] IT environment*" caused by the merger and "*supply chain*" issues that had been adversely impacting the Company's operations, Schmid explained that "[t]here are *simply too many manual workarounds* needed to run the business.  And this approach has *negative implications for our pre-sales activities, resource planning and supply chain*."

28.     In response to this news, the price of Diebold stock fell 16% to $12.90 per share by market close on May 2, 2018.

29.     Finally, on August 1, 2018, Diebold stunned investors when it posted a massive second quarter loss, revealed it had suffered an operating loss of over $130 million, and recorded a

$90 million goodwill impairment related to the merger with Wincor Nixdorf.  Diebold also slashed annual guidance, revealed it was in discussions with its lenders regarding further amending its credit agreement, and announced that it had abandoned the DN2020 integration and cost-savings program.  The announcement caused the price of Diebold common stock to plunge an astonishing 38%.

30.    In reaction to Diebold's shockingly poor results and the revelation of the truth concerning Diebold's business and operations, one analyst bluntly called it "*disturbing*" that Diebold was "*now riddled with inefficiency*," and sharply questioned Mattes's replacement, new CEO Schmid, apparently in exasperation, asking "*[w]here is the accountability* there for the 600-or-so basis points of margin compression you've seen since the merger?"  Schmid conceded that the "*fundamental reason*" for the Company's poor results post-merger was due to "*the complexity of our operating model*."

31.    Diebold common stock plunged on this news, falling a staggering 38% to $7.05 per share by market close on August 1, 2018, and shares continued to fall as the market absorbed the gravity of the disclosures and digested the truth about Diebold's business and operations.  By August 10, 2018, Diebold common stock had fallen an additional 43%, dropping to $3.95 per share at market close.

**Post-Class Period Events**

32.    The shock of these revelations and Diebold's poor performance prompted the redemption of approximately $255 million of non-controlling shares by legacy Wincor Nixdorf shareholders, triggering a liquidity crisis which forced the Company to renegotiate increased debt covenants with its lenders and seek emergency financing of $650 million.  Diebold was forced to tap its revolving credit line and even monetize $70 million in Company-owned life insurance contracts in order to purchase the legacy shares.

33.     On August 13, 2018, *CNBC* reported that Credit Suisse and Evercore were hired as advisers to help identify potential buyers for Diebold, citing private sources who noted that the rumored sale was related to the Company's "tight liquidity position."

34.     On August 16, 2018, *Bloomberg* reported that JPMorgan Chase & Co. had also been in secret talks with distressed-debt funders on Diebold's behalf regarding rescue financing, sending Diebold's shares even lower.  On August 27, 2018, Diebold announced that it had secured $650 million in additional financing to improve its liquidity position, and shortly thereafter Diebold entered into an amended credit agreement with its lenders to restructure its debt, while significantly increasing its debt levels and corresponding debt ratios.

35.     Then, on October 1, 2018, in the midst of Diebold's liquidity crisis, the Company announced that defendant Chapman, the Company's CFO, had left the Company "to pursue other opportunities."  Chapman's abrupt departure came less than a month before Diebold disclosed that it was required to take ***additional impairments of more than $109 million related to the Wincor Nixdorf merger*** in the third quarter, and a related adjustment in the fourth quarter of 2018, leading to total goodwill impairment for the year of over $217 million, almost $200 million of which was related to the merger.

36.     Altogether, by December 2018, the price of Diebold stock had fallen to less than $3 per share, more than ***90%*** below its Class Period high.

37.     Diebold would later admit in its March 1, 2019 SEC Form 10-K filing that it did not maintain effective controls over its financial reporting during the Class Period and "***[t]hroughout 2018***."  These material weaknesses still had not been remediated as of September 30, 2019.

38.     The cumulative return in a comparison of the Company's common shares during the Class Period relative to the S&P 500 index, the S&P Midcap 400 index, and the Company's stated 2017 and 2018 peer groups, from February 14, 2017 through December 28, 2018, is depicted below:



**Comparison of Class Period Price Movement\***

*Diebold's 2017 and 2018 Peer Groups Are Taken From the Company's 2018 SEC Form 10-K Filed March 1, 2019.

**JURISDICTION AND VENUE**

39.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

40.     Venue is proper in this District pursuant to §27 of the Exchange Act.  The acts and transactions giving rise to the violations of law complained of occurred in part in this District,

- 13 -

including the dissemination of false and misleading statements into this District.  In addition, Diebold common stock trades on the New York Stock Exchange ("NYSE").

41.     In connection with the acts and conduct alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

## PARTIES

**Lead Plaintiff**

42.     Lead Plaintiff Indiana Laborers Pension and Welfare Funds purchased Diebold common stock during the Class Period, as described in the certification attached hereto and incorporated herein by reference, and suffered damages.  On October 30, 2019, the Court appointed Indiana Laborers as Lead Plaintiff to represent the proposed class of Diebold investors.   On December 5, 2019, the Court reaffirmed the appointment of Indiana Laborers as Lead Plaintiff in response to a motion for reconsideration filed by another lead plaintiff candidate.

**Defendants**

43.     Defendant Diebold Nixdorf, Incorporated is an international financial and retail technology company with its headquarters located at North Canton, Ohio.  At all relevant times, Diebold common stock traded under the symbol DBD on the NYSE, which is an efficient market. During the Class Period, there were approximately 76 million shares of Diebold common stock outstanding.

44.     Defendant Andreas W. Mattes served as Diebold's President and CEO from June 2013 until he was asked to resign in December 2017.  Mattes was a member of the integration committee ("Integration Committee") established pursuant to the November 23, 2015 Merger Agreement in order to implement the integration of Diebold and Wincor Nixdorf.

4813-7945-3360.v4

45.     Defendant Christopher A. Chapman served as Diebold's CFO throughout the Class Period.  He also served as interim co-CEO between the tenures of defendant Mattes and Diebold's new CEO, Schmid, who was appointed in February 2018.  Chapman abruptly left the Company shortly after the Class Period ended, in October 2018.  Chapman was a member of the Integration Committee established pursuant to the Merger Agreement.

46.     Defendant Juergen Wunram served as Diebold's Chief Operating Officer ("COO") for most of the Class Period, from the time of the merger until May 31, 2018, when he left the Company.  Wunram was also a member of the Integration Committee established pursuant to the Merger Agreement, and for the year prior to February 2017, Wunram served as Diebold's Chief Integration Officer and "was heavily involved in getting the integration planning done."  He also served with defendant Chapman as interim co-CEO between the tenures of defendant Mattes and Schmid.  Prior to the merger, Wunram was Wincor Nixdorf's COO and CFO, and for two years prior to the merger, Wunram ran Wincor Nixdorf's Delta Restructuring Program.

47.     Defendants Mattes, Chapman and Wunram are referred to herein as the "Individual Defendants."  During the Class Period, the Individual Defendants ran the Company as hands-on managers, overseeing Diebold's operations, finances and integration, and made the materially false and misleading statements described herein.  As set forth more fully in ¶¶48-132, 148-163, the Individual Defendants had intimate knowledge about the merger and integration, as well as core aspects of Diebold's financial and business operations.  They were also intimately involved in deciding which disclosures would or would not be made by Diebold.

- 15 -

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING
## STATEMENTS AND OMISSIONS

**Fourth Quarter and Full-Year 2016 Earnings Release
and Conference Call; 2017 Investor Day Conference**

48.     The Class Period commences on February 14, 2017.  On that date, Diebold filed its SEC Form 8-K and issued a press release providing investors with its fourth quarter and full-year 2016 financial results, Diebold's first full quarter as a combined business following the merger with Wincor Nixdorf.  The release stated in part that "Diebold Nixdorf expects full-year 2017 revenue to be in the range of $5.0 billion to $5.1 billion, net loss in the range of $55 million to $30 million, and adjusted EBITDA in the range of $440 million to $470 million," with EPS of "approximately $(0.70) to $(0.40), or $1.40 to $1.70 on a non-GAAP basis."  Defendant Mattes was quoted in the release highlighting the Company's strategic acquisition of Wincor Nixdorf, stating in pertinent part:

> "Our fourth quarter profits were in line with our previous guidance. Additionally, I'm pleased with ***our strong free cash flow performance during the period, which is a testament to our collaborative teamwork during the first full quarter for our newly combined company***," said Andy W. Mattes, chief executive office, Diebold Nixdorf.  "Reflecting on 2016, it was a year of tremendous strategic achievements, in which we took major steps to accelerate our transformation and reshape our business portfolio while increasing our scale, power to innovate, geographic footprint and customer reach."

> "For 2017, we are focused on realizing our potential and delivering on our synergy goals . . . .  ***We enter the year leveraging a stronger, fully aligned global sales force, and a solid solutions portfolio with ample opportunity to succeed in the dynamic financial and retail markets***."

49.     That same day, Diebold hosted a call with investors to discuss the results.  The call was led by defendants Mattes and Chapman.  On the call, Mattes and Chapman repeated the financial results and outlook provided in Diebold's fourth quarter 2016 release and discussed the Wincor Nixdorf merger which had closed the prior August, claiming that it strategically positioned the Company to excel going forward and, as Mattes put it: "***These strategic achievements have had a profound impact on the Company***."

- 16 -

50.     Mattes stated that Diebold "continue[d] to make progress" on integration, and touted the positive effects of the integration, explaining that "[f]or the first time, the sales team is ***fully aligned*** around our goals, quotas, and account plans."  He further stated:

> We have made extensive changes to realign our sales organization, to be closer to our consumers, and we are investing in training, so our sales executives can be even better consultants to our customers on their digital journey.  ***These actions represent the foundation of our new sales excellence program***, which you will be hearing more about in the near future.

51.     Defendant Chapman echoed these statements in his prepared remarks to investors, stating:

> ***The teams are working very diligently on integration activities and driving cost synergies.  The cost benefits will flow more substantially through the P&L as we progress in the year***.  As a result, we anticipate about one-third of our adjusted EBITDA to be realized in the first half of the year, based on our current scheduled backlog and sequencing of our synergy realization.

52.     Indeed, in response to an analyst question concerning problems the Company experienced in the EMEA region in late 2016, defendant Mattes assured investors that initial sales integration issues were "***all . . . in the rear-view mirror.  Everybody is aligned***."  Later, Mattes again emphasized: "***[W]e've got everybody on the same goal sheet***.  We now have the full domination agreement between the two Companies, and ***all the quotas are aligned***."

53.     Defendant Mattes further emphasized: "We are confident to deliver cost synergies of $40 million in 2017," and defendant Chapman reinforced the target, stating that the Company was on track to realize "at least $40 million of our cost synergies" from the merger in 2017 alone.  And in response to a requests for clarification on the $40 million in synergies and whether Defendants were making progress in terms of integration, Chapman confirmed:

> I was starting to compensate, the comparisons that we're going to use, it's really going to be off of a base 2016, so ***the cost improvement moving forward***.  I think to do otherwise would be a bit difficult.  So that is what we're calling the base year.

- 17 -

Were there some benefits that we've gotten in the near term in 2016, yes, but we're not going to add that into the overall program that we're going to be talking to and elaborating a little bit more on here in a couple of weeks at the analyst day event. ***So we have seen very good progress, we have gotten organized, and the foundation work is in place***. Now, as Andy said, 2017 is about execution and looking to deliver on that overall number.

54.     On February 24, 2017, Diebold filed its annual report on SEC Form 10-K for the year ended December 31, 2016 (the "2016 Form 10-K"), which was signed by defendants Mattes, Chapman and Wunram.  The 2016 Form 10-K repeated the Company's financial results provided in the February 14, 2017 press release.  It also highlighted the purported benefits from the merger with Wincor Nixdorf, stating in pertinent part:

> ***The Company is executing a multi-year integration program designed to optimize the assets, business processes, and IT systems of Diebold Nixdorf.  This program, in aggregate, has identified an opportunity to realize approximately $160 [million] of cost synergies over three years***.  These cost synergies include:
>
> - Realizing volume discounts on direct materials
> - Harmonizing the solutions set
> - Increasing utilization rates of the service technicians
> - Rationalizing facilities in the regions
> - Streamlining corporate and general and administrative functions
> - Harmonizing back office solutions.
>
> The Company has and will continue to invest significant dollars to restructure the workforce, optimize legacy systems, streamline legal entities and consolidate real estate holdings.  ***By executing these integration activities, the Company expects to deliver greater innovation for customers, career enrichment opportunities for employees, and enhanced value for shareholders***.

55.     Diebold's 2016 Form 10-K also highlighted the purported goodwill acquired from the merger with Wincor Nixdorf, stating in pertinent part:

> The acquired Diebold Nixdorf AG goodwill is primarily the result of anticipated synergies achieved through increased scale, a streamlined portfolio of products and solutions, higher utilization of the service organization, workforce rationalization in overlapping regions and shared back office resources.  The Company also expects that, after completion of the Acquisition and integration, it will generate strong free cash flow, which would be used to make investments in innovative software and solutions and reduce debt.

- 18 -

56.     Finally, the 2016 Form 10-K contained false and misleading certifications by defendants Mattes and Chapman on Diebold's disclosure controls and procedures, which stated, in pertinent part, as follows:

I, [Andreas W. Mattes/Christopher A. Chapman], certify that:

1)     I have reviewed this annual report on Form 10-K of Diebold Nixdorf, Incorporated;

2)     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3)     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4)     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an

annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5)      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

57.      On February 28, 2017, following the release of the Company's fourth quarter and full-year 2016 financial results, and in advance of Diebold's investor conference later that day, the Company issued a press release titled: "***Diebold Nixdorf Reaffirms 2017 Guidance And Provides 2020 Financial Targets***," in which the Company introduced its "DN2020 roadmap" and "establishe[d] net cost improvement target of $200 million," increasing the previous $160 million cost savings target by $40 million.

58.      That same day Defendants hosted Diebold's 2017 Investor Day Conference. During the conference, defendants Mattes, Chapman and Wunram detailed the DN2020 integration plan and highlighted the benefits the Company was purportedly already realizing from its acquisition and integration of Wincor Nixdorf. Defendants explained that Diebold now expected $200 million in ***net*** savings from the deal, up from their previous expectation of $160 million, with presentation materials describing – in two locations – the transition as a "***[s]mooth integration of legacy organizations***."

- 20 -

59.     Mattes also highlighted the fact that they were integrating the companies with "***eyes wide opened***," aware of and "wrestling down . . . one at a time" the "challenges of integration." Mattes added:

> [When] we announced this and during the process and as you have experienced just like we did, doing a deal in Germany is not a trivial task and you have to go through quite a process to get it done.  People were pointing out a lot of things that were going wrong; appreciate all the input.  We lightheartedly depicted them here as alligators, so without going into everyone [sic] of those alligators, the main message is ***we went into this thing eyes wide opened*** and ***we've been wrestling down alligators one at a time***, still a few more to go, but we feel very confident about how we're going to do this.

*     *     *



60.     Recognizing that "60% of all the M&A deals that are being done fall short of the expectations," defendant Mattes assured investors that "***we're spending a lot of time and energy on the integration***" but that "***[b]y the same token, making sure that we drive operational excellence***." Mattes further assured investors that "the one thing that you learn is when you combine two companies, it's also ***probably the best benchmarking exercise we've ever done***.  Because on

- 21 -

everything that we do, we take a look at how did one side of the company do it and how did the other side of the company do it."

61.     With respect to the Company's sales and revenue, Mattes discussed the visibility Defendants had to ensure that the Company was realizing "sales excellence across the whole system," explaining that "come April, the whole company is going to be on one sales management tool, we're using Salesforce all around the globe, *so we know exactly who's doing what, where*.  Is our sales team truly embracing the broadened portfolio of the company that we have?  But more importantly, *since January, everybody is on the same goal sheets*."

62.     Following Mattes's presentation, defendant Wunram continued discussing the DN2020 program, its "financial targets," and "explain[ing] a bit the logic" behind the program, noting that: "What is very important that we try to make clear on this chart is that *the cost reduction performance of the company will be much more than this $200 million*."

> How does the $200 million cut down?  Well, what you see here is the cut down to cost of sales and to OpEx $50 million of the $200 million will go to the cost of sales – sorry, services.  And here the levers are *we have a lot of economies of scale opportunities in the different markets, where we have both companies have sales forces - sorry, field service technicians*.  And *we will, of course, have also a lot of economies of scale and best-of-approaches on global delivery*.  And global delivery means call center structure, spare parts and so on.  Olaf Heyden in his talk will dive deeper on those levers.
>
> *            *            *
>
> Third, our hardware business, so our Systems business, here we see a $60 million impact on cost of sales, OP impact.  And this is much around also getting complexity out of the business, joint product platforms and components, consolidating supplier base and so on, and taking capacities out, that will be possible if you take complexity out.  Here, Uli will explain you and show you much more in depth what are the levers here, what are the targets.
>
> Last but not least, OpEx, R&D, and SG&A, indeed, G&A.  For the R&D, the same levers that help us on the cost of sales in Systems will also help on the R&D side.  So *taking out complexity out of the portfolio*, but there is a big impact also on

- 22 -

the G&A, that is because we are combining, so to say, our organizations in the market.  And I will click down later on and show you more color around these levers.

63.     Defendant Wunram further discussed at length the measures already taken and the integration milestones already achieved, all while continuing to assure investors that Defendants "are aware of the risks."  For example, Wunram discussed how the cost savings would "ramp up over time," explaining that "early on, of course, *we have cleared up and taking out redundancy of our product offering to our - service offering to our customers*."  Wunram continued:

> However, I think *the main part of synergy capture will be in 2017 and 2018, and this goes along also with IT integration*.  I will talk in a minute about IT integration.  On the one hand side, *IT is a major enabler for getting value out of the synergies*.  On the other side, IT can also be very difficult to implement, and I will show you in a minute, how we handle that and how we believe that we have really taken out risk of that, and getting speed into that.
>
> *          *          *
>
> I think we did - after Day 1 [August 15], we did a lot of market communication and also internal communication.  We have defined the organization, it's ready.  Actually *its operational, a quite balanced organization, where we took really – selected also our staff and our managers and the best-of, I would say, based on performance*.
>
> We have *consolidated financial reporting* in place.  So our finance team got that in place.  We have done our budget planning for 2017, and a three-year financial plan together in one organization already.  We have detailed plans on the synergies, and we have early ramp-up of the synergy.  So all these things that we could do before a DPLA was registered.  We have done like procurement synergies, like some office consolidation, and also some management consolidation, we have done already.  And needless to say that we have to do a lot of communication internally with sales teams and with the management teams.
>
> *We are not naive*.  I think *all of us have in one or the other way been in similar situations*, in M&A situations and in merger or integration activities.  So, we are aware of the risks.  And this chart, it's not a crocodile chart that Andy had but at least it puts a lot of questions, and that were guiding questions for us, how we designed the program.
>
> So, first of all, *are the targets aspirational enough*?  We have talked about that.  Are you protecting your baseline sales?  Well, that's quite normal that you have a rocky period, if you just combine after Day 1, the company.  So the orders were not that strong during that phase here.  Nevertheless, *we have implemented a lot of*

- 23 -

*measures now, and that we believe that they are quite effective now*.  And I will lead you through in a minute.

Then the next two questions are, have you organized and prioritized the program?  I will give color around that.  In particular also on the execution speed, I know that you are interested in do are we fast enough?  And I will give you a couple of thoughts around that.  We believe we are indeed fast.

64.     Describing the steps already taken to integrate the two companies and the mechanisms in place to ensure that the synergies and integration would yield positive operational and sales results, Wunram stated that they have "a lot of meetings" and further explained:

In line with that, *we have installed a new Deal Review Process, which is effective already since couple of months now, there's very good feedback*.  We have a lot of sales team work on how to combine hardware sales with software, professional service and managed service sales.  We see a lot of such deals, which are really very positive for us but also provide a lot of value to our customers.

So all that is set up, we have, Andy said, *in April, we are going to [indiscernible] joint sales automation system, so everybody is working to the same processes*.  And we believe that we have put in place a lot of effective measures now that sales is on a very good roadmap.

So now, maybe a couple of thoughts to the program design.  Of course, I mean one of the main trigger is really to get the targets down to individual organizations and even to individuals.  *We have done this.  We have also leveraged, and you see also the background of some of us best-of-approaches, benchmarking, so we really took professional toolsets to set our DN2020 up.  We have a transformation program which drives the whole thing*.

*              *              *

On the integration, we will measure the total synergies realized, I think we measure more – we will also have the so-called *Degree of Implementation* status.  That is a *pre-indicator* how far are we with detailing and making the action programs mature.  That *gives us, so to say, an early view on where we have to intervene if things are not quick enough*.

*              *              *

On the operational excellence, of course the typical gross margins for the different buckets, but also attach rates and these kind of things.  Underneath is complete score cards which trigger down to the very detailed operational level.

- 24 -

This is an example – a real example – I removed the numbers – for the DOI implementation. *So every month*, we would have, so to say, for the complete program, also trigger down for the individual areas of responsibilities, the *measurement on the degree of implementation of the measure*. So this is a very rigid method to get things done to have an early indicator, to have *an early indicator also for intervention if things are not on the right track*.

*     *     *





65.      Wunram continued, explaining how IT would "be a big enabler for synergy capture" and how keeping each company's ERP system would be more efficient and would "take[] out" a lot of the risk:

There's another part, I mentioned IT. *IT will be a big enabler for synergy capture. But how do we ensure that we will not have a long period of time that we integrate and roll out new ERP systems? For example, we have planned and will do a dual ERP strategy. That means we take the legacy Diebold ERP system in the Americas. We take the legacy Nixdorf ERP system in Europe and Asia Pac. The advantages, we don't have to roll out new systems but rather migrate data from the smaller organization just in the existing instance. That gives a lot of speed and takes out a lot of risks*.

I'm not saying that it's not work but *you don't have any risk on doing new ERP systems rolling out something new*. It's really a data migration and training effort and not an implementation of new IT systems. So, that should give you a bit

- 25 -

of – of course, we would have data consolidation layer that Chris gets his numbers, and we have the KPIs on the global level, but that's the strategy.

66.     And to drive home the point that Defendants' commitments were not merely aspirational, Mattes closed the investor conference by confirming, in no uncertain terms, that management would indeed achieve their committed integration targets:

> [Analyst]: Thanks for the presentation.  Andy, I wanted to ask you, sometimes, management teams characterize these long-term goals as a target that they hope to exceed and sometimes, they characterize it as a target they hope to meet. So, I'm kind of curious the way you're thinking about it and the way that you kind of convey it to your team.

> [Mattes]: Well, there is clearly two approaches to that.  To the team, we want to be as aggressive as we can be.  As I told you earlier, we actually even structured the compensation to incentivize overachievement.  But by the same token, *with an audience like this*, I know that you guys have elephant brains, so you won't forget any numbers.  ***These numbers are a commitment that we will achieve***.

67.     On March 3, 2017, Diebold issued its Preliminary Proxy Statement, in which it continued to tout the progress of the integration and the "profound impact" its "strategic achievements have had" on the Company:

> ***These strategic achievements have had a profound impact on us***, as we have doubled the size of our Company and have significantly enhanced our mix of revenue.

> We ***continue to make progress on our integration, and our cost synergy efforts are geared towards the realization of scale effects in the hardware business and streamlining our management and workforce composition***.  Our ***sales team is fully aligned*** around our goals, quotas and account plans.  In 2017, we have made extensive changes to ***realign our sales organization*** to be closer to our customers, and we are investing in training so our sales executives can be best in class consultants to our customers on their digital journey.

68.     These statements were repeated in the Company's March 13, 2017 Definitive Proxy Statement:

> We ***continue to make progress on our integration, and our cost synergy efforts are geared towards the realization of scale effects in the hardware business and streamlining our management and workforce composition***.  Our ***sales team is fully aligned*** around our goals, quotas and account plans.  In 2017, we have made

- 26 -

extensive changes to ***realign our sales organization*** to be closer to our customers, and we are investing in training so our sales executives can be best in class consultants to our customers on their digital journey.

69.     Defendants' statements during February and March 2017 (¶¶48-68) were false and misleading when made.  Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a)     Contrary to Defendants' assertions in ¶¶50 and 52 that "[e]verybody is aligned," "we've got everybody on the same goal sheet," and "[f]or the first time, the sales team is fully aligned around our goals, quotas, and account plans," and in addition to the other reasons set forth in ¶69, Defendants were not able to "leverag[e] a stronger, fully aligned global sales force" because Diebold had not successfully remediated integration-related sales problems stemming from the Wincor Nixdorf merger and such problems were not "all . . . in the rear-view mirror."  In fact they were worsening and the Company was still missing out on sales opportunities and losing market share to competitors in both Europe and North America as a result of the integration problems.  In fact, contrary to Defendants' assurances that while pursuing their integration targets and "making sure [to] drive operational excellence," the undisclosed truth was that "***the breadth of the product range***" and "***the current operating model still reflects some elements of legacy norms from the historical 2 entities***" had added unnecessary complexity and preventing the Company from operating effectively as later admitted by Schmid, Diebold's new CEO.  Indeed, as later admitted by Schmid, "***the excessive complexity on our own product portfolio***" that still existed added "***vulnerability to [Diebold's] supply chain***."  As defendant Chapman subsequently admitted on August 1, 2018, the supply chain issues led to "higher shipping costs from expedited freight in order to mitigate supply chain delays and meet our customer delivery schedules."  Only on August 1,

- 27 -

2018, did the Company admit that "supply chain disruptions" would take "a couple of quarters to address" and had led to upwards of $50 million in lost revenue;

(b)     Contrary to Defendants' positive representations in ¶¶58 and 65 concerning the "*[s]mooth integration of legacy organizations*" and that using a "*dual ERP strategy*" "*gives a lot of speed and takes out a lot of risk*," and in addition to the other reasons set forth in ¶69, the Company was actually encountering extreme difficulties integrating the two legacy sales forces, IT systems, and inventory management systems and had run into other operational difficulties.  Indeed, far from "getting complexity out of the business" and "*clear[ing] up and taking out redundancy of our product offering to our – service offering to our customers*," at the end of the Class Period Diebold's new CEO Schmid admitted that in reality, "*the combination of the [two] organizations in late 2016*" was a "*core driver[] for the additional complexity in our IT environment*."  Indeed, as later admitted by Schmid, on May 2, 2018, the integration efforts had led to "*a number of inconsistent processes in different regions . . . exacerbated by a complex IT environment*" and there were also "*too many manual workarounds needed to run the business*" which were having "*negative implications for [Diebold's] pre-sales activities, resource planning and supply chain*."  In fact, Diebold's use of split systems, *i.e.*, using separate ERP systems which Defendants claimed "*gives a lot of speed and takes out a lot of risks*," actually created double the work than if the Company had only been using one system.  In fact, by using each legacy company's separate Oracle and SAP systems employees had to manually do tasks that should have been automated.  For example, certain information that was added to Oracle also had to be manually added to SAP, and to add the information to the SAP system required that "tickets" needed to be submitted to a group in Germany to be entered into SAP.  And Diebold's project related to integrating different software

- 28 -

systems used for ATM monitoring had a lot of issues, was running months behind schedule, and had been failing;

(c)     Defendants' statements in ¶¶51, 53-54 and 57 concerning "cost improvement[s]," "cost synergies," and "cost benefits" were materially false and misleading. in addition to the other reasons set forth in ¶69, because as Schmid admitted, Defendants omitted to disclose that Diebold's "cost structure" was still "inefficient" and "***continue[d] to reflect attributes of the 2 legacy companies as well as the complexity inherent in the breadth of our product lines***";

(d)     Contrary to Defendants' statements in ¶48 of "strong free cash flow performance" and it being "a testament to our collaborative teamwork during the first full quarter for our newly combined company," and in addition to the other reasons set forth in ¶69, the undisclosed truth was that the two companies were actually being poorly integrated and the reported cost savings were taken at the expense of the Company's sales and business operations.  As a result, Diebold was actually suffering from tens of millions of dollars in operational inefficiencies, cost overruns, and debilitating supply chain problems that led to increased costs for expedited shipping, and Diebold was on track to suffer hundreds of millions of dollars in additional losses in 2018 beyond what had been previously represented to investors.  In actuality, Diebold was tracking nearly $400 million below 2017 revenue targets and was on track to suffer more than $100 million in losses for the year beyond what had been represented to investors;

(e)     Diebold required hundreds of millions of dollars in additional capital to fully integrate Wincor Nixdorf;

(f)     Defendants' certifications pursuant to §302 of the Sarbanes-Oxley Act, attesting that the financial information contained in Diebold's SEC filings was true (¶56), that they did not omit material facts, and that the Company's internal disclosure controls were effective, were

false and misleading because Diebold failed to disclose that the existing internal controls over financial reporting were deficient and needed to be "***enhanced***."  Indeed, as Diebold admitted on February 28, 2019, it had: (1) "ineffective information technology general controls (ITGCs) used for financial reporting by certain entities throughout the organization"; (2) "ineffective implementation and operation of controls over inventory valuation"; and (3) "ineffective controls over non-routine transactions" which led to "misstatements to goodwill impairment, inventory and redeemable non-controlling interests."  And Diebold's controls, which had been enhanced "[t]hroughout 2018" from their deficient state in 2017, remained defective at least through December 31, 2018; and

(g)     that, as a result of (a)-(f) above, Diebold's business and operations were materially impaired as a result of the merger, the Company was suffering from accelerating losses, it had overvalued assets acquired in the Wincor Nixdorf merger by at least $100 million, and Defendants' financial projections lacked a reasonable basis in fact.

70.     Defendants' statements in February and March 2017, which were false and misleading when made, had a direct effect on Diebold's stock price, which continued to trade at artificially inflated levels.  For example, on February 14, 2017, in response to Defendants' statements, Diebold's stock price closed up 7.54% at $29.25.

**First Quarter 2017 Earnings Release and Conference Call,**
**and JP Morgan Tech, Media and Telecom Conference**

71.     On May 4, 2017, Diebold issued a press release providing investors with the first quarter 2017 financial results.  The release stated that Diebold had achieved quarterly GAAP revenue of $1.1 billion and a GAAP EPS loss of $0.78, or EPS of $0.08 on a non-GAAP basis.  The press release also lowered the Company's full-year 2017 outlook to $5 billion in revenue (from $5-$5.1 billion) and net losses of between $75 million and $50 million (from $55 - $30 million), while reaffirming the year's adjusted EBITDA at between $440 million and $470 million.  Defendant

Mattes was quoted in the release highlighting the closing of the Wincor Nixdorf acquisition and the Company's purportedly solid integration efforts and growth trajectory:

> "***The transition to Diebold Nixdorf is complete***; now, we truly begin our long-term transformation with the DN2020 program we launched during the quarter . . . .  From a market perspective, I'm especially encouraged by the solid sequential growth in systems orders and backlog we generated during the period. This is a good indication that ***our sales engine is gearing up after the breaking-in period of our new company in the second half of last year***."

72.    Later that day, defendants Mattes and Chapman hosted an earnings call with analysts and investors to discuss the Company's results.  During the call defendants repeated the financial results and outlook provided in Diebold's first quarter 2017 release and discussed the Wincor Nixdorf integration, representing that the Company was meeting or exceeding integration expectations.  For example, defendant Mattes stated: "I'm pleased to report that we're off to a good start. . . .  I'm encouraged by the early progress and ***our ability to coordinate numerous intersecting activities***.  This gives us confidence that ***we should be able to exceed our cost synergy targets for the year***."  Mattes also stated that "***[o]ur continued focus on cost reductions allows us to maintain our profitability and free cash flow targets***."

73.    The following chart was presented to investors and analysts during the call:



Q1-17 Highlights

- Transition to Diebold Nixdorf is essentially complete
  - Domination Agreement is in place
  - New lines of business fully implemented
- Ramping up our long-term transformation activities
- DN2020 launched in February
- Strong sequential order growth in Q1-17
  - Continued strength in retail
  - Banking orders picking up
- Renewals of significant outsourcing contracts

74.    Also on May 4, 2017, Diebold filed its SEC Form 10-Q for the quarter ended March 31, 2017.  The Form 10-Q, signed by defendants Mattes and Chapman, repeated the Company's

- 31 -

financial results provided in the May 4, 2017 press release and highlighted purported benefits from

the merger with Wincor Nixdorf, stating in pertinent part:

> The acquired Diebold Nixdorf AG goodwill is primarily the result of anticipated synergies achieved through increased scale, a streamlined portfolio of products and solutions, higher utilization of the service organization, workforce rationalization in overlapping regions and shared back office resources. The Company also expects, after completion of the business combination and related integration, to generate strong free cash flow, which would be used to make investments in innovative software and solutions and reduce debt. The Company has preliminarily allocated goodwill to its Services, Software and Systems reportable operating segments.

75.     In addition, the Form 10-Q for the first quarter of 2017 detailed the DN2020

integration program, addressed the purported "Financ[ial] Excellence," "Operational Excellence"

and "Sales Excellence" aspects of the plan, and highlighted the purported strategic benefits from

the merger with Wincor Nixdorf:

> *Pursuing Finance Excellence –* ***the Company will continuously improve its financial reporting***, analysis and forecasting by emulating best practices from similar business entities. The Company's initiatives are designed to improve forecasting accuracy, optimize working capital management and pursue prudent capital allocation strategies which enhance shareholder value. At present, the Company's capital allocation priorities are to reduce its leverage and accelerate the realization of its synergies.

> \*      \*      \*

> *Pursuing Operational Excellence –* the Company will implement best practices to improve operational efficiency and increase customer satisfaction. Robust reporting and tracking tools will be used to achieve best-in-class service and manufacturing levels.

> \*      \*      \*

> *Pursuing Sales Excellence –* a capable and progressive sales organization is vital to the future growth of the Company. The Company will invest in the sales organization to ensure it has the skills, resources, and processes needed to support the growth of each LOB.[3] At the country level, we will optimize sales staffing and invest in partner programs commensurate with overall market demand. As a result of

---

[3]     "LOB" is "line of business."

these investments, the Company expects to increase its pipeline of opportunities and increase its win rate over time.

76.     The Form 10-Q for the first quarter of 2017 also highlighted "[t]he business drivers of the Company's future performance," which include the "***integration of legacy salesforce, business processes, procurement, and internal IT systems***; and ***realization of cost synergies, which leverage the Company's global scale, reduce overlap and improve operating efficiencies***."

77.     Finally, the Form 10-Q contained false and misleading certifications by defendants Mattes and Chapman on Diebold's disclosure controls and procedures, which were substantively identical to the certifications made in the Company's 2016 Form 10-K filing.  *See* ¶56, *supra*.

78.     On May 4, 2017, Diebold held a conference call with investors and analysts, led by defendants Mattes and Chapman, to discuss the Company's first quarter 2017 financial results. Mattes took the opportunity to tout the progress of the integration, stating, in part:

> During the first quarter, our company completed the transition to Diebold Nixdorf.  We finalized the domination agreement and ***fully implemented the line of business structure as evidenced by our new reporting segment***, which you can read about in the 10-Q filed this morning.
>
> Now we're ramping up our long-term transformation activities with the launch of our DN2020 program, which we announced at our Investor Day in February.
>
> I'm pleased to report that ***we're off to a good start***.  From a market perspective, ***we're seeing continued strength in retail and we're beginning to see banking order activity pick up***.  These trends drove systems order growth of more than 30% sequentially in constant currency with double-digit gains in banking and retail across EMEA and Asia Pac.
>
> *           *           *
>
> ***With respect to our DN2020 transformation program, the company is off to a good start under the leadership of our new COO, Jurgen Wunram***.
>
> Let me provide some tangible examples of our activities.  We announced plans to close our manufacturing plants in Hungary.  The company has also received all necessary approvals to wind down the legacy Diebold distribution center in the Netherlands.  And in April, ***the whole company transitioned to Salesforce.com,***

- 33 -

*which allows us to better manage our sales teams and processes in a consistent fashion*.

        \*      \*      \*

During our next earnings call, you will hear a more detailed update on our DN2020 transformation program from Jurgen. *I'm encouraged by the early progress and our ability to coordinate numerous intersecting activities*. This gives us confidence that *we should be able to exceed our cost synergy targets for the year*. Innovation is a core component of our connected commerce strategy and retail is one of the more progressive.

79.     During the Q & A portion of the call, Mattes discussed the Company's fourth quarter 2016 integration-related sales issues and "market share losses," which Mattes had previously assured investors were "all in the rearview mirror," explaining:

Look, *Q4 was weak*. *We had home-grown issues in Europe*, including the fact we still had people on different comp plans. *We didn't have a common management* tool. If you take a look at our growth and our book-to-bill ratio in EMEA, as I said in my prepared remarks, that EMEA had double-digit gains both in banking and retail. So we feel very encouraged. And if I see the customers feedback, if I see the conversations that we're being invited to, lot of positive momentum. And it's not just one country, it's across a whole bunch of countries where the activity is going strong. You saw our press release about recycling in Russia, which was a huge step forward. You can also see recycling. It was a technology that started in Asia is now literally moving east, starting in Eastern Europe, coming to Western Europe, eventually it will hit the Americas. So lot of positive momentum. Lot of positive customer feedback. And if I may just take a look at the retail side, if you recall, last year was legacy Nixdorf's probably best year in retail. And we're topping those order numbers from where we were a year ago. So again, lot of momentum building out our leadership position in that market and – especially driven by opportunities in this go market.

80.     On May 22, 2017, defendant Mattes presented to investors and analysts at the JPMorgan Tech, Media and Telecom Conference, during which he claimed once again that the Company had "*fix[ed]*" its integration-related sales force issues, explaining that the "biggest thing" is that now "*everybody is singing off the same hymn sheet*." He continued in pertinent part:

[A]s much as you prepare for integration, unless people know who's the account manager . . ., they won't put in the right effort. And if you take a look at our order numbers, *Q1, we're up nearly 30% in orders versus Q4. So you can clearly see that we've turned that page and we closed that chapter and we're back in the race*.

- 34 -

81.     Mattes also suggested that Diebold was tracking ahead of its integration targets, stating in pertinent part:

> And *on the ramp curve, I'm actually very encouraged of where we stand*. *We track all of these synergies. We have a wave tool in which every one of the ideas that we go after is being tracked*, from origination to becoming tangible until it shows up on our bottom line. And as we said in our analyst call, we think that we will have *pressure to increase the synergy realization numbers upwards* in this calendar year, so very good efforts on the work of the teams.

82.     Defendants' statements during May 2017 (¶¶71-81) were false and misleading when made. Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a)     Contrary to Defendants' assertions in ¶80 that "*everybody is singing off the same hymn sheet*," and in addition to the other reasons set forth in ¶82, Diebold concealed the fact that it had not "*fix[ed]*" its integration-related sales force issues. In fact they were worsening and the Company was still missing out on sales opportunities and losing market share to competitors in both Europe and North America as a result of the integration problems. Indeed, while Defendants highlighted the "*integration of legacy salesforce, business processes, procurement, and internal IT systems*" as a "business driver[] of the Company's future performance," as Schmid admitted, "*the breadth of the product range*" and "*the current operating model still reflects some elements of legacy norms from the historical 2 entities*" had added unnecessary complexity and preventing the Company from operating effectively. Indeed, while Defendants highlighted the "*realization of cost synergies, which leverage the Company's global scale, reduce overlap and improve operating efficiencies*" as a "business driver[] of the Company's future performance," as later admitted by Schmid, "*the excessive complexity on our own product portfolio*" that still existed added "*vulnerability to [Diebold's] supply chain*." And defendant Chapman admitted on August 1, 2018, that the supply chain issues led to "higher shipping costs from expedited freight in order to mitigate supply chain delays and meet our customer delivery schedules." Only on August 1, 2018, did the

- 35 -

Company admit that "supply chain disruptions" would take "a couple of quarters to address" and had led to upwards of $50 million in lost revenue;

(b)     Contrary to Defendants' positive representations in ¶¶71 and 78 that they had "fully implemented the line of business structure as evidenced by our new reporting segment" and that "[t]he transition to Diebold Nixdorf is complete," and in addition to the other reasons set forth in ¶82, Diebold was encountering extreme difficulties integrating the 2 legacy sales forces, IT systems, and inventory management systems and had run into other operational difficulties.  Indeed, as admitted by Diebold's new CEO Schmid, "the combination of the two organizations in late 2016" was a "core driver[] for the additional complexity in our IT environment" and the companies had not been fully integrated, but had simply been in the midst of a "journey to integrate."  Additionally, the Company was actually encountering extreme difficulties integrating the two legacy sales forces, IT systems, and inventory management systems and as Diebold's new CEO Schmid admitted that in reality, "the combination of the 2 organizations in late 2016" was a "core driver[] for the additional complexity in our IT environment" and the integration efforts had led to "a number of inconsistent processes in different regions . . . exacerbated by a complex IT environment."  There were "too many manual workarounds needed to run the business" which were having "negative implications for our pre-sales activities, resource planning and supply chain";

(c)     Defendants' statements in ¶¶72 and 78 concerning, "cost synergy targets" and "cost reductions" were materially false and misleading because, in addition to the other reasons set forth in ¶82, they omitted to disclose that Diebold's "cost structure" was still "inefficient" and "***continue[d] to reflect attributes of the 2 legacy companies as well as the complexity inherent in the breadth of [Diebold's] product lines***," as admitted by Schmid.  In fact, in May 2017 Diebold held a high-level invite-only meeting in Europe to discuss the serious integration problems the

- 36 -

Company was struggling with, and asked business leaders to make additional cost cuts by January

2018, despite the fact that deep cuts had already been made;

(d)     Defendants' statement in ¶72 that their "continued focus on cost reductions

allows us to maintain our profitability and free cash flow targets" and that Diebold's "ability to

coordinate numerous intersecting activities" would enable Defendants "to exceed our cost synergy

targets for the year" were false and misleading because, in addition to the other reasons set forth in

¶82, they omitted to disclose that the two companies were actually poorly integrated and the reported

cost savings were taken at the expense of the Company's sales and business operations, causing

Diebold to suffer from tens of millions of dollars in operational inefficiencies, cost overruns, and

debilitating supply chain problems that led to increased costs for expedited shipping, and therefore

Diebold was on track to suffer hundreds of millions of dollars in additional losses in 2018 beyond

what had been previously represented to investors; that Diebold was tracking nearly $400 million

below 2017 revenue targets and was on track to suffer more than $100 million in losses for the year

beyond what had been represented to investors;

(e)     Diebold required hundreds of millions of dollars in additional capital to fully

integrate Wincor Nixdorf;

(f)     Defendants' certifications pursuant to §302 of the Sarbanes-Oxley Act,

attesting that the financial information contained in Diebold's SEC filings was true (¶77), that they

did not omit material facts, and that the Company's internal disclosure controls were effective, were

false and misleading because Diebold failed to disclose that the existing internal controls over

financial reporting were deficient and needed to be "***enhanced***."  Indeed, as admitted on February

28, 2019, throughout 2018 Diebold had: (1) "ineffective information technology general controls

(ITGCs) used for financial reporting by certain entities throughout the organization"; (2) "ineffective

- 37 -

implementation and operation of controls over inventory valuation"; and (3) "ineffective controls over non-routine transactions" which led to "misstatements to goodwill impairment, inventory and redeemable non-controlling interests."   And Diebold's controls, which had been enhanced "[t]hroughout 2018" from their deficient state in 2017, remained defective at least through December 31, 2018; and

> (g)   that, as a result of (a)-f) above, Diebold's business and operations had been materially impaired as a result of the merger, the Company was suffering from accelerating losses, Diebold had overvalued assets acquired in the Wincor Nixdorf merger by at least $100 million, and Defendants' financial projections lacked a reasonable basis in fact.

83.   In addition, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item 303"), required the 2016 Form 10-K to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."   Defendants' failure to disclose the full extent of the Company's integration problems set forth in the previous paragraph was a violation of Item 303 because they were known trends and uncertainties that were likely to, and did, have a material unfavorable impact on the Company's revenues and income from continuing operations.

84.   Defendants' statements in May 2017, which were false and misleading when made, had a direct effect on Diebold's stock price, which continued to trade at artificially inflated levels.

**Second Quarter 2017 Earnings Release and Conference Call;**
**Lowered Financial Outlook**

85.   On July 5, 2017, two weeks before the Company was scheduled to release financial results for the second quarter of 2017, the Company shocked the market when it issued a surprise press release lowering its financial outlook for 2017.   The Company blamed "a longer customer decision-making process and order-to-revenue cycle."   The Company stated that it now expected

- 38 -

2017 revenue of only between $4.7 billion and $4.8 billion, down from $5.0 billion, and "earnings per share on a GAAP basis" "in the range of $(1.65) - $(1.45), or $0.95 - $1.15 on a non-GAAP basis."

86.     On the unexpected guidance cut, which came only a few weeks after Defendants had again represented that integration efforts were proceeding smoothly and that Diebold's "continued focus on cost reductions" had allowed the Company "to maintain [its] profitability and free cash flow targets," the price of Diebold stock plunged 23% to $21.60 by market close on July 5, 2017, hitting year-to-date lows on abnormally high volume of over 10 million shares traded.

87.     Because investors did not know the full truth about the Company's integration problems, however, the price of Diebold stock remained artificially inflated and Defendants continued to mislead investors about the true state of Diebold's business and operations.  For example, at the same time Diebold had lowered its 2017 guidance it actually ***raised*** its purported $200 million in merger synergies by $40 million, to $240 million.  Concerning the increased merger-related cost savings, Mattes noted that "we continue to improve our operating expenses from the prior year and are taking steps to further accelerate our cost reductions."  And although Diebold shares were "falling hard" on this news, in response to Defendants' reassurances, investment analysts at *The Motley Fool* were encouraged by the increase in the Company's integration savings target to $240 million, finding that "Diebold's long-term story appears to remain intact."  Keybanc Capital Markets issued an analyst report in response to Defendants' press release similarly highlighting the companies "M&A synergies" and noting that "[e]xecution from a cost perspective is trending well and generally above expectations."

88.     Two weeks later, on July 19, 2017, Diebold issued a press release providing investors with its second quarter 2017 financial results.  The release stated that Diebold had achieved quarterly

GAAP revenue of $1.1 billion and a GAAP EPS loss of $0.41, or EPS of $0.08 on a non-GAAP

basis.  It also reaffirmed the Company's recently lowered 2017 outlook of $4.7 to $4.8 billion in

revenue and stated that Diebold was on track to post net losses of between $125 million and $110

million and adjusted EBITDA of $360 million to $380 million.  In the release, defendant Mattes

reassured investors that the "'***sales trend has been improving***,'" and declared, "'[a]s we near the first

anniversary of the combination of our two companies, I am more confident than ever that we are

uniquely positioned to deliver innovative solutions to our customers and long-term value to our

stakeholders.'"

89.    That same day, Diebold hosted an earnings call to discuss the results, led by

defendants Mattes and Chapman.  On the call, defendants repeated the financial results and outlook

provided in Diebold's second quarter 2017 release and addressed for the first time the surprise

"significant revisions" to the Company's 2017 full-year release outlook announced two weeks

earlier.  Mattes described the main factors that led to the revised outlook as follows:

> The biggest change is to our top line, where we see full year revenue coming
> in about $300 million less than previously anticipated.  The weakness is
> predominantly tied to our banking hardware volume, which also has a direct negative
> correlation to our installation services business.  And while the recent order activity
> demonstrates the market acceptance of our new solutions and the competitive
> advantage we bring to our customers, the pace of orders to date is still short of our
> expectations.
>
> Additional contributing factors are for: One, prolonged installation schedules
> causing delayed backlog conversions; and secondly, earlier than expected contract
> runoffs from legacy Wincor base in the U.S. and a few niche IT service contracts in
> Europe.
>
> We also reduced our profit outlook due to the impact of the lower revenue
> and higher costs in our service business due to a complex timing challenge.  This
> includes lower utilization of service techs due to the accelerated runoffs in the above-
> mentioned contracts.  This was coupled with our strategic investments to maintain
> our competitive advantage in break-fix services and grow our market – our managed
> services and ATM-as-a-Service business.

- 40 -

90.     Despite the massive $300 million revision to Diebold's full-year outlook, Mattes assured investors that the Company had put in place remedial measures to not only reverse the adverse trends but also to realize even more purported benefits from the merger:

> With respect to our overall integration, *we have completed or are in the process of completing, several actions which should benefit our P&L by the end of the year*.  For example, *we have taken all necessary actions to close our legacy Diebold plant in Hungary and our distribution logistics center in The Netherlands*, and we expect to complete these closures by year-end.

> We are *well on our way to reducing redundant stocking locations globally. As of today, we have closed some 200 locations and expect to close another 100 by the end of the year*.

> *We have also made good progress on integrating the field service organization, which includes unifying the legacy IT systems and logistics support*.

> With our work *nearly complete in about 70% of countries*, we expect to drive increased operating efficiencies through fewer calls and faster fix rates.  We're also making greater use of lower-cost call centers, both offshore and nearshore, to improve both the cost and performance of our global delivery infrastructure.

> On the organizational front, we will continue to remove management layers, reduce headcount and improve our decision-making processes.  We've reduced our global headcount by more than 600 FTEs, and we expect another 300 employees will exit the business by year-end.

> Finally, *we continue to review our portfolio of businesses to reduce complexity* and emphasize our more profitable entities.  During the quarter, we completed the sale of our Electronic Security business in Mexico and reached an agreement to divest our legacy Diebold business in the U.K., opening the door for us to pursue major customers in this country with the full breadth of our portfolio.

> *Our DN2020 initiatives continue to point to significant scale benefits for the new company*.  As a result of the *increased visibility on our cost structure*, *we now expect net savings of $240 million by the end of 2020*.

91.     Despite the revised outlook and Chapman's concession that Diebold had "underestimated the amount of distractions tied to the integration, the amount of change that we introduced into the organization and also the size of the hole that we dug ourselves as we exited '16

and came into '17," Chapman continued to tout the purported improvements and the progress of the

ahead-of-schedule integration and cost savings:

> [L]et me first go through the overall change in the DN2020 cost targets.  So we had
> outlined approximately $200 million at that time, and we've increased it to $240
> million.  You can hear from the expectations in '17, *we're looking to run at about
> an additional $10 million through*.  And if you think about it from a sequential
> standpoint, *we're looking at pulling some things in from the 2020 standpoint into
> '19 and accelerating some of the activities where we've seen very good progress*.  If
> you break it down by the major categories that we highlighted previously, I'll just
> take you through the 3 main buckets here.  We'd indicated service cost of sales
> benefits were roughly $50 million.  We're increasing that to $65 million.  On the
> system side, we previously had approximately $60 million, and we're increasing that
> to $70 million.  And then on the overall op expense side, we were at $90 million, and
> we're increasing that to around $105 million.  So that's the rough breakdown of what
> we see.  With regards to the $3.50, that remains our outlook for the long term, and
> we are looking at pursuing all appropriate pathways to achieve that over the next
> several years.

92.     On July 26, 2017, Diebold filed its SEC Form 10-Q for the quarter ended June 30,

2017, which was signed by defendants Mattes and Chapman.  The quarterly report repeated the

Company's financial results provided in the July 19, 2017 press release and highlighted the

purported strategic benefits from the merger with Wincor Nixdorf:

> Commensurate with its strategy, the Company is executing a multi-year
> integration and transformation program, called DN2020, which aligns employee
> activities with the Company's goal of delivering operating profit of $240 [million] by
> the year 2020.  By executing the program, the Company expects to deliver greater
> innovation for customers, career enrichment opportunities for employees, and
> enhanced value for shareholders.  DN2020 consists of six inter-related elements:
>
> *              *              *
>
> *Pursuing Finance Excellence* – the Company will continuously improve its
> financial reporting, analysis and forecasting by emulating best practices from similar
> business entities.  The Company's initiatives are designed to improve forecasting
> accuracy, optimize working capital management and pursue prudent capital
> allocation strategies which enhance shareholder value.  At present, the Company's
> capital allocation priorities are to reduce its leverage and accelerate the realization of
> its synergies.
>
> *              *              *

- 42 -

*Pursuing Operational Excellence* – the Company will implement best practices to improve operational efficiency and increase customer satisfaction. Robust reporting and tracking tools will be used to achieve best-in-class service and manufacturing levels.

\*      \*      \*

*Pursuing Sales Excellence* – a capable and progressive sales organization is vital to the future growth of the Company. The Company will invest in the sales organization to ensure it has the skills, resources, and processes needed to support the growth of each LOB. At the country level, we will optimize sales staffing and invest in partner programs commensurate with overall market demand. As a result of these investments, the Company expects to increase its pipeline of opportunities and increase its win rate over time.

93.    The second quarter 2017 Form 10-Q also addressed Diebold's acquired goodwill attributed to the merger, explaining that "[t]he acquired Diebold Nixdorf AG goodwill is primarily the result of anticipated synergies achieved through increased scale, a streamlined portfolio of products and solutions, higher utilization of the service organization, workforce rationalization in overlapping regions and shared back office resources."

94.    The Form 10-Q also highlighted integration and synergies as Diebold's business drivers, including the "***integration of legacy salesforce, business processes, procurement, and internal IT systems; and realization of cost synergies, which leverage the Company's global scale, reduce overlap and improve operating efficiencies***."

95.    Finally, the Form 10-Q filing contained Mattes's and Chapman's false and misleading certifications concerning Diebold's disclosure controls and procedures, which were substantively identical to the false and misleading certifications made in the Company's 2016 Form 10-K filing. *See* ¶56, *supra*.

96.    Later, during the Company's September 11, 2017 presentation at the Barclays Global Financial Service Conference, defendant Mattes again discussed the earlier integration-related sales force issues, which had led to material customer losses leading into the Class Period:

- 43 -

[Analyst]:  I know you that guys had acknowledged a loss of momentum in the ATM business in the second half of '16.  I think just flow share decline.  I mean, are these similar, related to the deal timing?  Or are these just in a rearview mirror now?

[Mattes]:  *No, no.  That's all in the rearview mirror*.

97.    Defendants' statements in July and September 2017 (¶¶85-96) were false and misleading when made.  Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a)    Contrary to Defendants' assertions in ¶96, Diebold had not successfully remediated integration-related sales problems stemming from the Wincor Nixdorf merger and such problems were not "*all in the rearview mirror*."  In fact they were worsening and the Company was still missing out on sales opportunities and losing market share to competitors in both Europe and North America as a result of the integration problems.  Indeed, while Defendants highlighted the "*integration of legacy salesforce, business processes, procurement, and internal IT systems*" and "*realization of cost synergies, which leverage the Company's global scale, reduce overlap and improve operating efficiencies*" as a "business drivers of the Company's future performance," as Schmid later admitted, "*the breadth of the product range*" and the fact that "*the current operating model still reflects some elements of legacy norms from the historical 2 entities*" had led to unnecessary complexity and prevented the Company from operating efficiently or effectively.  Indeed, "the excessive complexity on our own product portfolio" during the Class Period had added "vulnerability to [Diebold's] supply chain."  As defendant Chapman admitted on August 1, 2018, the supply chain issues led to "higher shipping costs from expedited freight in order to mitigate supply chain delays and meet our customer delivery schedules."  Only on August 1, 2018, did the Company admit that "supply chain disruptions" would take "a couple of quarters to address" and had led to upwards of $50 million in lost revenue;

- 44 -

(b)     Contrary to Defendants' positive representations in ¶90 concerning the progress of the "overall integration" and the touted "good progress" made "***integrating the field service organization, which includes unifying the legacy IT systems and logistics support***," in addition to the other reasons set forth in ¶97, Diebold was encountering extreme difficulties integrating the two legacy sales forces, IT systems, and inventory management systems and had run into other operational difficulties.  Indeed, as admitted by Schmid, "***the combination of the 2 organizations in late 2016***" was a "***core driver[] for the additional complexity in our IT environment***" and the integration efforts had led to "***a number of inconsistent processes in different regions . . . exacerbated by a complex IT environment***."   There were "***too many manual workarounds needed to run the business***" which were having "***negative implications for our pre-sales activities, resource planning and supply chain***."  Diebold's use of split systems, *i.e.*, using separate ERP systems which Defendants claimed "***gives a lot of speed and takes out a lot of risks***," actually created double the work than if the Company had only been using one system.  In fact, by using each legacy company's separate Oracle and SAP systems employees had to manually do tasks that should have been automated.  For example, certain information that was added to Oracle also had to be manually added to SAP, and to add the information to the SAP system required that "tickets" needed to be submitted to a group in Germany to be entered into SAP.  And Diebold's project related to integrating different software systems used for ATM monitoring had a lot of issues, were by this time running nine months behind schedule, and had been failing;

(c)     Defendants' statements in ¶¶90 and 94 concerning  "cost synergies" as well as Defendants' assurances that "[a]s a result of the increased visibility on our cost structure, ***we now expect net savings of $240 million by the end of 2020***," were materially false and misleading for the other reasons set forth in ¶97, and because they omitted to disclose that Diebold's "cost structure"

- 45 -

was still "inefficient" and "*continue[d] to reflect attributes of the 2 legacy companies as well as the complexity inherent in the breadth of [Diebold's] product lines*," as Schmid admitted on August 1, 2018.  In fact, in May 2017 Diebold held a high-level invite-only meeting in Europe to discuss the serious integration problems the Company was struggling with, and asked business leaders to make additional cost cuts by January 2018, despite the fact that deep cuts had already been made;

        (d)      Contrary to Defendants' statements in ¶¶86-87 that their "continued focus on cost reductions allows us to maintain our profitability and free cash flow targets" and that "we continue to improve our operating expenses from the prior year and are taking steps to further accelerate our cost reductions," and in addition to the other reasons set forth in ¶97, Defendants failed to disclose that the two companies were actually poorly integrated and the reported cost savings were taken at the expense of the Company's sales and business operations, causing Diebold to suffer from tens of millions of dollars in operational inefficiencies, cost overruns, and debilitating supply chain problems that led to increased costs for expedited shipping, and therefore Diebold was on track to suffer hundreds of millions of dollars in additional losses in 2018 beyond what had been previously represented to investors and that Diebold was tracking nearly $400 million below 2017 revenue targets and was on track to suffer more than $100 million in losses for the year beyond what had been represented to investors;

        (e)      Diebold required hundreds of millions of dollars in additional capital to fully integrate Wincor Nixdorf;

        (f)      Defendants' certifications pursuant to §302 of the Sarbanes-Oxley Act, attesting that the financial information contained in Diebold's SEC filings was true (¶95), that they did not omit material facts, and that the Company's internal disclosure controls were effective, were false and misleading because Diebold failed to disclose that the existing internal controls over

- 46 -

4813-7945-3360.v4

financial reporting were deficient and needed to be "***enhanced***."  Indeed, as admitted on March 1, 2019, Diebold had: (1) "ineffective information technology general controls (ITGCs) used for financial reporting by certain entities throughout the organization"; (2) "ineffective implementation and operation of controls over inventory valuation"; and (3) "ineffective controls over non-routine transactions" which led to "misstatements to goodwill impairment, inventory and redeemable non-controlling interests."  And Diebold's controls, which had been enhanced "[t]hroughout 2018" from their deficient state in 2017, remained defective at least through December 31, 2018; and

        (g)     that, as a result of (a)-(f) above, Diebold's business and operations had been materially impaired as a result of the merger, the Company was suffering from accelerating losses, Diebold had overvalued assets acquired in the Wincor Nixdorf merger by at least $100 million, and Defendants' financial projections lacked a reasonable basis in fact.

        98.     Defendants' statements in July and September, 2017, which were false and misleading when made, had a direct effect on Diebold's stock price, which continued to trade at artificially inflated levels.  For example, on July 5, 2017, the price of Diebold fell over 22%, following the significant reduction in guidance, while on July 19, 2017, in response to Defendants' false and misleading statements, Diebold's stock price closed up over 3.0% at $22.00, and Defendants' false and misleading statements on July 26, 2017, and September 11, 2017, repeated earlier misstatements and maintained the inflation, preventing greater reductions in the stock price.

**Third Quarter 2017 Earnings Release and Conference Call**

        99.     On October 31, 2017, Diebold issued a press release providing investors with its third quarter 2017 financial results.  The release stated that Diebold had achieved quarterly GAAP revenue of $1.1 billion and a GAAP EPS loss of $0.47, or EPS of $0.58 on a non-GAAP basis.  The press release also lowered the Company's 2017 revenue outlook to $4.6 billion (from $4.7-$4.8

billion) and net losses to $140 million to $130 million (from between $125 million and $110 million), but raised adjusted EBITDA to $370 million to $380 million.  The release quoted defendant Mattes, who claimed that Diebold had made great strides in its integration efforts, cost synergies, and implementing the Company's growth strategies:

> *We are encouraged to see our integration and transformation achievements begin to translate into meaningful cost synergies, as improved earnings during the quarter were driven by a combination of cost actions as well* as a lower tax rate.

100.    That same day, Defendants hosted an earnings call with investors and analysts to discuss the results.  The call was led by defendants Mattes, Chapman and Wunram.  During the call, defendants repeated the third quarter 2017 financial results and outlook and defendant Mattes stated that "integration and transformation achievements" had "translate[d] into ***meaningful cost synergies*** during the third quarter" and that ***the Company was "achieving the integration milestones, which we established***."

101.    Defendant Wunram echoed these statements, stating in part:

> ***Our integration accomplishments are clear***.  ***We can see the projects being executed and can see the results in our operating profit***.  While there is still work ahead of us, the company has already made many of the difficult and complex changes to adjust the cost baseline, which is necessary in an integration of our size.
>
> ***As previously committed, our DN2020 program will expect to deliver $240 million operating profit impact through 2020***.  We expect the cost savings to be delivered as follows: $105 million in OpEx through corporate and regional functional management integration, back-office and shared service integration, as well as R&D synergies and scale.  On the cost of sales side, we are targeting $135 million in operating profit impact, of which $70 million will come from systems and $65 million from services.
>
> ***Our achievements and outlook on the integration of DN2020 cost savings remain positive.   Our systematic approach, comprehensive implementation framework and controlling methodology has helped to align the company with this crucial program***.  The organization is committed to deliver on our DN2020 initiatives to achieve our cost reduction target, as well as the broader transformational objectives within the DN2020 framework.  Getting our cost basis

- 48 -

right provides us with the capacity to make strategic investments and focus on growth.

102.    Also on October 31, 2017, Diebold filed its quarterly report on SEC Form 10-Q for the quarter ended September 30, 2017, which was signed by defendants Mattes and Chapman.  The report repeated the Company's third quarter financial results provided in the October 31, 2017 press release and highlighted the purported "Finance Excellence," "Operational Excellence" and "Sales Excellence" elements of the DN2020 program:

>    *Pursuing Finance Excellence* – the Company will continuously improve its financial reporting and analysis by adopting best practices from similar business entities.  The Company's initiatives are designed to improve forecasting accuracy, optimize working capital management and pursue prudent capital allocation strategies which enhance shareholder value.  At present, the Company's capital allocation priorities are to reduce its leverage and accelerate the realization of its synergies.

>    \*      \*      \*

>    *Pursuing Operational Excellence* – the Company will implement best practices to improve operational efficiency and increase customer satisfaction to strengthen its industry leadership.  Robust reporting and tracking tools will be used to measure progress towards achieving best-in-class service levels and manufacturing efficiencies.

>    \*      \*      \*

>    *Pursuing Sales Excellence* – a capable and progressive sales organization is vital to the future growth of the Company.  The Company will invest in the sales organization to ensure it has the skills, resources, and process needed to support customers at all stages of their digital journeys.  At the country level, we will optimize sales staffing and invest in partner programs commensurate with overall market demand.  As a result of these investments, the Company expects to increase its pipeline of opportunities and increase its win rate over time.

103.    The 2017 Form 10-Q for the third quarter of 2017 also highlighted integration and cost synergies as Diebold's business drivers, including the "*[i]ntegration of legacy salesforce, business processes, procurement, and internal IT systems*; and *[r]ealization of cost synergies, which leverage the Company's global scale, reduce overlap and improve operating efficiencies*."

104.     In addition, the Form 10-Q also addressed Diebold's goodwill attributed to the merger, explaining that "[t]he acquired Diebold Nixdorf AG goodwill is primarily the result of anticipated synergies achieved through increased scale, a streamlined portfolio of products and solutions, higher utilization of the service organization, workforce rationalization in overlapping regions and shared back office resources."

105.     Finally, the Form 10-Q filing contained false and misleading certifications by defendants Mattes and Chapman on Diebold's disclosure controls and procedures, which were substantively identical to the certifications made in the Company's 2016 Form 10-K filing. *See* ¶56, *supra*.

106.     Defendants' statements in October 2017 (¶¶99-105) were false and misleading when made.  Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a)     Contrary to Defendants' positive representations in ¶¶99-100 that the "integration and transformation achievements" had "translate[d] into meaningful cost synergies . . . during the [third] quarter" and that Diebold was "achieving the integration milestones, which we established," and for the other reasons set forth in ¶106, the Company was in reality encountering extreme difficulties integrating the two legacy sales forces, IT systems, and inventory management systems and had run into other operational difficulties.  As Schmid admitted, the integration efforts had led to "*a number of inconsistent processes in different regions* . . . *exacerbated by a complex IT environment*" and there were also "*too many manual workarounds needed to run the business*" which were having "*negative implications for our pre-sales activities, resource planning and supply chain*."  And as Schmid explained, "*the combination of the two organizations in late 2016*" was a "*core driver[] for the additional complexity in our IT environment*."  And Diebold's use of split systems, *i.e.*, using separate ERP systems which Defendants claimed "*gives a lot of speed and*

- 50 -

4813-7945-3360.v4

*takes out a lot of risks*," actually created double the work than if the Company had only been using one system.  In fact, by using each legacy company's separate Oracle and SAP systems employees had to manually do tasks that should have been automated.  For example, certain information that was added to Oracle also had to be manually added to SAP, and to add the information to the SAP system required that "tickets" needed to be submitted to a group in Germany to be entered into SAP.  And Diebold's project related to integrating different software systems used for ATM monitoring had a lot of issues, were by this time running nine months behind schedule, and had been failing;

(b)      Contrary to Defendants' statements in ¶¶99-101 and 103 relating to "cost savings," "cost synergies," "cost actions," and "cost reduction target[s]," as well as Defendants' assurances that "*[w]e can see the projects being executed and can see the results in our operating profit*," and in addition to the other reasons set forth in ¶106, Defendants omitted to disclose that Diebold's cost structure was still "*inefficient*" and "*continue[d] to reflect attributes of the 2 legacy companies as well as the complexity inherent in the breadth of [Diebold's] product lines,*" as admitted by Schmid on August 1, 2018.  In fact, in May 2017 Diebold held a high-level invite-only meeting in Europe to discuss the serious integration problems the Company was struggling with, and asked business leaders to make additional cost cuts by January 2018, despite the fact that deep cuts had already been made.  And while Defendants highlighted the "*[i]ntegration of legacy salesforce, business processes, procurement, and internal IT systems*" and "*[r]ealization of cost synergies, which leverage the Company's global scale, reduce overlap and improve operating efficiencies*" as a "business drivers of the Company's future performance," as Schmid later admitted: "*the breadth of the product range*" and the fact that "*the current operating model still reflects some elements of legacy norms from the historical 2 entities*" had led to unnecessary complexity and prevented the Company from operating efficiently or effectively.  Indeed, as Schmid also admitted on August 1,

- 51 -

2018, "*the excessive complexity on our own product portfolio*" during the Class Period had added "*vulnerability to [Diebold's] supply chain*."  As defendant Chapman admitted on August 1, 2018, the supply chain issues led to "higher shipping costs from expedited freight in order to mitigate supply chain delays and meet our customer delivery schedules."  Only on August 1, 2018, did the Company admit that "supply chain disruptions" would take "a couple of quarters to address" and had led to upwards of $50 million in lost revenue;

(c)     Defendants' assertion in ¶¶99-100 that the "integration and transformation achievements" are "begin[ning] to translate into meaningful cost synergies, as improved earnings during the quarter were driven by a combination of cost actions," was false and misleading because, in addition to the other reasons set forth in ¶106, Defendants failed to disclose that the two companies were actually poorly integrated and the reported cost savings were taken at the expense of the Company's sales and business operations, causing Diebold to suffer from tens of millions of dollars in operational inefficiencies, cost overruns, and debilitating supply chain problems that led to increased costs for expedited shipping, and Diebold was therefore on track to suffer hundreds of millions of dollars in additional losses in 2018 beyond what had been previously represented to investors and that Diebold was tracking nearly $400 million below 2017 revenue targets and was on track to suffer more than $100 million in losses for the year beyond what had been represented to investors;

(d)     Diebold required hundreds of millions of dollars in additional capital to fully integrate Wincor Nixdorf;

(e)     Defendants' certifications pursuant to §302 of the Sarbanes-Oxley Act, attesting that the financial information contained in Diebold's SEC filings was true (¶105), that they did not omit material facts, and that the Company's internal disclosure controls were effective, were

- 52 -

false and misleading because Diebold failed to disclose that the existing internal controls over financial reporting were deficient and needed to be "*enhanced*."  Indeed, as admitted on March 1, 2019, Diebold had: (1) "ineffective information technology general controls (ITGCs) used for financial reporting by certain entities throughout the organization"; (2) "ineffective implementation and operation of controls over inventory valuation"; and (3) "ineffective controls over non-routine transactions" which led to "misstatements to goodwill impairment, inventory and redeemable non-controlling interests."  And Diebold's controls, which had been enhanced "[t]hroughout 2018" from their deficient state in 2017, remained defective at least through December 31, 2018; and

        (f)      that, as a result of (a)-(e) above, Diebold's business and operations had been materially impaired as a result of the merger, the Company was suffering from accelerating losses, Diebold had overvalued assets acquired in the Wincor Nixdorf merger by at least $100 million, and Defendants' financial projections lacked a reasonable basis.

        107.    Defendants' statements on October 31, 2017, which were false and misleading when made, had a direct effect on Diebold's stock price, preventing greater reductions in the stock price which continued to trade at artificially inflated levels.

**Defendant Mattes Is Terminated for Failing
to Execute Strategy and Drive Results**

        108.    On December 13, 2017, Diebold issued a press release announcing that defendant Mattes was stepping down effective immediately, with defendants Chapman and Wunram taking over as interim Co-CEOs.  A Company spokesman confirmed that defendant Mattes had been asked to leave due to Diebold's poor financial performance following the merger with Wincor Nixdorf, revealing that the decision to terminate Mattes "came from the board of directors based on executing our strategy, driving results and delivering value for our stakeholders."

- 53 -

**Fourth Quarter and Full-Year 2017 Earnings
Release and Conference Call**

109.    On February 13, 2018, Diebold issued a press release providing investors with the

Company's fourth quarter and full-year 2017 financial results.  According to the release, Diebold

had achieved quarterly GAAP revenue of $1.2 billion and a GAAP EPS loss of $1.43, or EPS of

$0.40 on a non-GAAP basis.  For the full year, Diebold generated only $4.6 billion in revenue,

nearly $400 million below prior estimates.  It also suffered a loss of over $205 million for the year.

The release also provided Diebold's 2018 outlook, projecting revenues of between $4.5 billion and

$4.7 billion, a net loss of between $65 million and $40 million, and adjusted EBITDA of between

$380 million and $410 million.  The release also projected 2018 GAAP EPS of between ($0.80) to

$(0.50) and an adjusted EPS of between $1.00 and $1.30.  Defendant Wunram was quoted in the

release as stating: "*[W]e are pleased with the pace of our integration efforts*, which are enabling the

company to streamline costs, increase productivity and strengthen our competitiveness."

110.    That same day, defendants Wunram and Chapman hosted an earnings call with

investors and analysts to discuss the results.  On the call, defendants repeated the financial results

and outlook provided in Diebold's fourth quarter 2017 release, and defendant Chapman stated:

"Looking to 2018, we are encouraged by the stability and improvements we've seen in the services

and software businesses over the past 2 quarters.  We've delivered double-digit growth in software

order entry and have a solid service contract base entering the year."  Similarly, defendant Wunram

stated that Diebold had made *considerable progress on its integration initiatives*, stating in pertinent

part:

>           We made *significant progress in 2017*.  We have reduced headcount by
> 1,300 full-time positions, with a net impact closer to 1,000 employees.  While this
> activity occurred throughout the organization, *a larger proportion came from G&A
> functions, such as finance, IT and support roles*.

- 54 -

In addition, we are streamlining G&A spend through process improvements, greater use of shared services and implementation of best practices. Next, as of today, we have consolidated more than three quarters of our redundant country legal entities. This project simplifies business processes at the country level, and ***boosts productivity by unifying our core IT systems***. ***These activities are resulting in incremental G&A synergies from management integration, back-office consolidation and operational excellence***.

*     *     *

We have reduced our global manufacturing capacity from 180,000 ATMs per year to around 100,000. We also streamlined the number of ATM models by more than 50%, and renegotiated more than 90% of our direct material spend. These activities have taken on greater importance to maintain our gross margin in the systems line of business, while we have experienced lower demand for banking hardware. Within the Services line of business, we have consolidated and standardized service delivery for approximately 90% of countries. To enhance our operating efficiency, we have also eliminated approximately 1/4 of our service parts depots around the globe.

***Through our execution of the DN2020 program, the company realized over $100 million of savings as the result of our integration and operational excellence programs during 2017 and we expect to realize at least another $50 million of savings in 2018***.

111.    During the call, defendant Chapman touched on Diebold's supply chain, stating that the Company had "recently experienced a ***few growing pains*** and associated ***minor supply chain delays*** that will impact our systems revenue." And defendant Wunram downplayed the supply chain issues and revenue loss, highlighting the "good work" done on the supply chain and assuring investors that the revenue "***will not go away***," but will just "***probably shift from Q1 [to] a later quarter***."

112.    On February 21, 2018, Diebold issued a press release announcing the appointment of Schmid as its new President and CEO. The Company described Schmid as "an established, world-class leader with the right experience to enhance our customer relationships, lead a cohesive world-class team and sharpen our focus on unlocking growth opportunities across the company." Schmid was quoted in the release stating that Diebold's "global leadership position and broad customer base,

- 55 -

provide fertile ground to drive opportunities in the financial and retail industries. I will look to leverage these advantages to improve financial performance, deliver value for customers and shareholders and create opportunities for our employees."

113.   On February 28, 2018, Diebold filed its annual report on SEC Form 10-K for the year ended December 31, 2017 (the "2017 Form 10-K"), which was signed by defendants Chapman and Wunram. The 2017 Form 10-K repeated the Company's financial results provided in the February 13, 2018 press release. It also discussed the purported benefits from the merger with Wincor Nixdorf and highlighted the elements of the DN2020 program, stating in pertinent part:

> *Pursuing Finance Excellence* – the Company will continuously improve its financial reporting, analysis and controls by emulating best practices from similar business entities. The Company's initiatives are designed to improve forecasting accuracy, optimize working capital management and pursue prudent capital allocation strategies which enhance shareholder value. At present, the Company's capital allocation priorities are to reduce its leverage and accelerate the realization of its cost reductions and synergies.

> \*     \*     \*

> *Pursuing Operational Excellence* – to strengthen its market leading position, the Company will implement best practices to improve operational efficiency and increase customer satisfaction. Robust reporting and tracking tools will be used to achieve best-in-class service and manufacturing levels.

> \*     \*     \*

> *Pursuing Sales Excellence* – a capable and progressive sales organization is vital to the future growth of the Company. ***The Company will invest in the sales organization to ensure it has the skills, resources, and processes needed to support customers in their digital transformation journey***. At the country level, we will optimize sales staffing and invest in partner programs commensurate with overall market demand. As a result of these investments, the Company expects to increase its pipeline of opportunities and increase its win rate over time.

114.   The 2017 Form 10-K also highlighted Diebold's business drivers, including integration-related drivers such as the "***[i]ntegration of legacy salesforce, business processes,***

*procurement, and internal IT systems" and "[r]ealization of cost reductions and synergies, which*

*leverage the Company's global scale, reduce overlap and improve operating efficiencies*."

115.    In addition, Diebold's 2017 Form 10-K highlighted the Company's goodwill related

to the merger with Wincor Nixdorf, stating in pertinent part:

> The acquired Diebold Nixdorf AG goodwill is primarily the result of anticipated synergies achieved through increased scale, a streamlined portfolio of products and solutions, higher utilization of the service organization, workforce rationalization in overlapping regions and shared back office resources.   The Company also expects, after completion of the business combination and related integration, to generate improved free cash flow, which would be used to make investments in innovative software and solutions and reduce debt.  The Company has allocated goodwill to its Services, Software and Systems reportable operating segments.  The goodwill associated with the Acquisition is not deductible for income tax purposes.

116.    The 2017 Form 10-K also falsely and misleadingly represented that Diebold's

disclosure controls and internal control over financial reporting were operating effectively when they

were not, for the reasons alleged herein.

117.    Finally, the 2017 Form 10-K contained false and misleading certifications by

defendants Wunram and Chapman on Diebold's disclosure controls and procedures, which stated, in

pertinent part, as follows:

> I, [Juergen Wunram /Christopher A. Chapman], certify that:
>
> 1)    I have reviewed this annual report on Form 10-K of Diebold Nixdorf, Incorporated;
>
> 2)    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3)    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4)      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5)      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

118.    Defendants' statements in February 2018 (¶¶109-117) were false and misleading when made.  Defendants knew or recklessly disregarded, but failed to disclose, the following:

- 58 -

(a)      While Defendants highlighted in ¶114 the "*[i]ntegration of legacy salesforce, business processes, procurement, and internal IT systems*" as a business driver of the Company's future performance, this was false and misleading because, in addition to the other reasons set forth in ¶118, as Schmid admitted, the integration efforts had led to "*a number of inconsistent processes in different regions . . . exacerbated by a complex IT environment*" and there were also "*too many manual workarounds needed to run the business*" which were having "*negative implications for our pre-sales activities, resource planning and supply chain*";

(b)      Contrary to Defendants' positive representations in ¶109 concerning "the pace of our integration efforts, which are enabling the company to streamline costs, increase productivity and strengthen our competitiveness," in addition to the other reasons set forth in ¶118, Diebold was encountering extreme difficulties integrating the two legacy sales forces, IT systems, and inventory management systems and had run into other operational difficulties.  As admitted by Schmid "the combination of the two organizations in late 2016" was a "core driver[] for the additional complexity in our IT environment."  And Diebold's use of split systems, *i.e.*, using separate ERP systems which Defendants claimed at the beginning of the Class Period "gives a lot of speed and takes out a lot of risks," actually created double the work than if the Company had only been using one system.  In fact, by using each legacy company's separate Oracle and SAP systems employees had to manually do tasks that should have been automated.  For example, certain information that was added to Oracle also had to be manually added to SAP, and to add the information to the SAP system required that "tickets" needed to be submitted to a group in Germany to be entered into SAP.  And Diebold's project related to integrating different software systems used for ATM monitoring had a lot of issues, were by this time running at least nine months behind schedule, and had been failing;

- 59 -

(c)     And while Defendants highlighted the "integration of legacy salesforce, business processes, procurement, and internal IT systems" and "[r]ealization of cost reductions and synergies, which leverage the Company's global scale, reduce overlap and improve operating efficiencies" (¶¶110, 114) as a business drivers of the Company's future performance, as well as their "significant progress in 2017," noting that "a larger proportion came from G&A functions, such as finance, IT and support roles," as Schmid later admitted, "the breadth of the product range" and the fact that "the current operating model still reflects some elements of legacy norms from the historical 2 entities" had added unnecessary complexity and prevented the Company from operating efficiently or effectively.  Indeed, contrary to Defendants' statements that they were experiencing "minor" supply chain delays and "growing pains," or that the lost revenue would "not go away," as Schmid also admitted on August 1, 2018, "the excessive complexity on our own product portfolio" that still existed during the Class Period had added "vulnerability to [Diebold's] supply chain" as defendant Chapman admitted on August 1, 2018, the supply chain issues led to "higher shipping costs from expedited freight in order to mitigate supply chain delays and meet our customer delivery schedules."  Only on August 1, 2018, did the Company admit that "supply chain disruptions" would take "a couple of quarters to address" and had led to upwards of $50 million in lost revenue;

(d)     Defendants' assertion that "[t]hrough our execution of the DN2020 program, the company realized over $100 million of savings as the result of our integration and operational excellence programs during 2017 and we expect to realize at least another $50 million of savings in 2018" (¶110) was false and misleading because, in addition to the other reasons set forth in ¶118, it omitted to disclose the above facts and that Diebold's cost structure, even at the end of the Class Period, was still "inefficient" and "continue[d] to reflect attributes of the 2 legacy companies as well as the complexity inherent in the breadth of our product lines."  In fact, in May 2017 Diebold held a

high-level invite-only meeting in Europe to discuss the serious integration problems the Company was struggling with, and asked business leaders to make additional cost cuts by January 2018, despite the fact that deep cuts had already been made.  The two companies were actually poorly integrated and the reported cost savings were taken at the expense of the Company's sales and business operations, causing Diebold to suffer from tens of millions of dollars in operational inefficiencies, cost overruns, and debilitating supply chain problems that led to increased costs for expedited shipping, and Diebold was therefore on track to suffer hundreds of millions of dollars in additional losses in 2018 beyond what had been previously presented to investors;

(e)     Diebold required hundreds of millions of dollars in additional capital to fully integrate Wincor Nixdorf;

(f)     Defendants' certifications pursuant to §302 of the Sarbanes-Oxley Act, attesting that the financial information contained in Diebold's SEC filings was true (¶117), that they did not omit material facts, and that the Company's disclosure controls and internal control over financial reporting were effective, were false and misleading because Diebold failed to disclose that the existing internal controls over financial reporting were deficient and needed to be "*enhanced*." In fact, the finance team suffered from the same cumbersome manual processes as other areas of the Company, and monthly and yearly closings and reconciliations that could have and should have been automated were instead very labor intensive.  Indeed, as admitted on March 1, 2019, Diebold had: (1) "ineffective information technology general controls (ITGCs) used for financial reporting by certain entities throughout the organization"; (2) "ineffective implementation and operation of controls over inventory valuation"; and (3) "ineffective controls over non-routine transactions" which led to "misstatements to goodwill impairment, inventory and redeemable non-controlling

- 61 -

interests."  And Diebold's controls, which had been enhanced "[t]hroughout 2018" from their deficient state in 2017, remained defective at least through December 31, 2018; and

(g)     that, as a result of (a)-(f) above, Diebold's business and operations had been materially impaired as a result of the merger, the Company was suffering from accelerating losses, Diebold had overvalued assets acquired in the Wincor Nixdorf merger by at least $100 million, and Defendants' financial projections lacked a reasonable basis.

119.    In addition, Item 303 required the 2017 Form 10-K to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Defendants' failure to disclose the extent of the Company's integration problems as set forth in the previous paragraph, was a violation of Item 303 because they were known trends and uncertainties that were likely to, and did, have a material unfavorable impact on the Company's revenues and income from continuing operations.

120.    Defendants' statements during February 2018, which were false and misleading when made, had a direct effect on Diebold's stock price, preventing greater reductions in the stock price which continued to trade at artificially inflated levels.

121.    On March 22, 2018, Diebold announced that defendant Wunram would be exiting the Company on May 31, 2018.  According to reporting by the *Akron Beacon Journal* on March 23, 2018, Wunram decided it was the right time to leave "based on the ***advanced integration*** of Diebold and the former Wincor Nixdorf" and the appointment of Schmid as the new CEO.  At the time, however, the DN2020 integration program was expected to continue for another approximately 17 months.

**The Truth About Defendants' False and**
**Misleading Statements Begins to Emerge;**
**Diebold Abandons Its DN2020 Program**

122.    On May 2, 2018, Diebold issued a press release announcing disappointing first

quarter 2018 financial results.  The release stated that Diebold had achieved revenue of $1.1 billion

for the quarter and suffered a $21 million operating loss, and revised upward the projected net loss

for the year by about $30 million, to a range of between $95 million and $75 million.  In addition,

Diebold announced it was suspending its shareholder dividend to improve its cash position and debt

position.  On a conference call to discuss the results, Schmid, Diebold's new CEO, admitted that

***Diebold had been rendered too "complex" by the integration of Wincor Nixdorf***, and blamed much

of the Company's problems on previously undisclosed issues created by the acquisition, such as "a

number of ***inconsistent processes*** in different regions . . . which are ***exacerbated by a complex IT***

***environment***."

123.    Analysts expressed surprise that Diebold was still dealing with unnecessary

complexities and costs, as they understood from prior management's comments that the issues had

been largely remediated.  One analyst noted the revelation that Diebold was still dealing with "***the***

***complexity, the inefficiency, the overburden, the IT systems use manual workarounds***" and

questioned, "***what needs to be done here, because the company has thrown tens of millions, if not***

***even $100 million plus.  They're trying to fix this massive – this IT problem***.  And I guess, ***I'm a***

***little surprised to hear it's still this big of a problem***."  Schmid responded diplomatically, focusing

on "***additional complexity in [the] IT environment***" caused by the merger and noting the "supply

chain" issues:

>    ***There are simply too many manual workarounds needed to run the business***.  And
> this approach has ***negative implications for our pre-sales activities, resource***
> ***planning and supply chain***.

- 63 -

*       *       *

*I'll try and take a forward-looking view to that question without providing any commentary on the past. I think at the – from my vantage point, the combination of the 2 organizations in late 2016 was probably one of the core drivers for the additional complexity in our IT environment.* I do think it's important that as part of my strategic agenda, I look to explore ways to further standardize and harmonize that platform. These are obviously not straightforward easy initiatives, as I'm sure you can well appreciate, especially when one's touching supply chain in the European environment. I do think that I made earlier on reference to the *cultural differences between the 2 prior organizations*. I think that was a determinant in not necessarily getting ahead of this question, ahead of time. But I would just simply say, it needs to be an important part of my agenda.

124.    In response to another question "about complex operations," Schmid explained:

*[T]he breadth of the product range is certainly one core driver for complexity*. The other driver is that, we're in many, many markets with varying levels of overhead required to ensure that we can operate effectively in those markets. And then the third driver of complexity is that, as I alluded to in my earlier comments, *the current operating model still reflects some elements of legacy norms from the historical 2 entities*.

125.    On this news, the price of Diebold stock fell 16% to $12.90 per share by market close on May 2, 2018, on abnormally high volume of over 6 million shares traded.

126.    However, because investors still did not know the full truth about the Company's integration problems and the extent to which they had harmed the business, including that Diebold would soon be abandoning the DN2020 program, and that Diebold would soon be taking a goodwill impairment charge of approximately $200 million related to the merger, the price of Diebold stock remained artificially inflated. Indeed, at the same time Diebold issued disappointing first quarter 2018 financial results, it largely reaffirmed the Company's unachievable 2018 financial guidance, which lacked a reasonable basis. And full extent of the supply chain issues and Diebold's resulting inability to meet customer delivery schedules had not yet been disclosed.

127.    Then, on August 1, 2018, in connection with the Company's release of its second quarter 2018 financial results, Diebold shocked the market by disclosing that its business condition

- 64 -

was far worse than previously disclosed.  Diebold revealed that it had suffered an operating loss of over $131 million during the quarter, which included a $90 million impairment of assets primarily related to the Wincor Nixdorf merger.  The Company also revised its annual revenue guidance downward to $4.5 billion, the bottom of its prior range.  Even more concerning, it revealed that the Company was tracking $100 million below prior adjusted EBITDA estimates, at a range of only $280 million to $320 million, while net losses for the year were expected to reach a staggering ***$365 million to $325 million***.  As a result, Diebold stated that it needed to engage its lenders to review its credit agreements, an indication that the Company was running into significant liquidity concerns.[4]

128.     In the earnings release and on the conference call to discuss the second quarter results, Diebold once again blamed previously undisclosed complexities and inefficiencies created by the Wincor Nixdorf acquisition, despite the fact that the merger had closed nearly ***two years earlier***.  Schmid conceded, "it is clear that more action is needed to fundamentally change the way we operate."  Specifically, Schmid admitted that Diebold's poor performance was related to the "***high degree of complexity that permeates our business***," and that the Company was now "focused on several actions to simplify our operations and rationalize our cost structure," including "***stabilizing the supply chain, strengthening our IT environment*** and investing in new more cost-effective product platforms."  And as Schmid further explained:

> These disappointing operational matters and higher costs, some of which are temporary, while others will take longer to work through, impacted our quarterly profits and are the main reasons why we are revising our outlook for 2018.
>
> It has become quite clear to me that complexity is driving higher costs in the business.  As I mentioned on the prior call, ***our cost structure is inefficient*** because

---

[4]     Indeed, Diebold's liquidity position was so dire that the Company did not have enough money to make payroll at this time and needed to borrow money from a creditor that insisted that Diebold reduce costs by 20% within 30 days.

it ***continues to reflect attributes of the 2 legacy companies as well as the complexity inherent in the breadth of our product lines***.

\*        \*        \*

At the end of the day, ***the complexity of our operating model*** effectively has services actions distributed globally across multiple operating units, which, quite frankly, I think, ***is the fundamental reason for – the reason why we are – where we are today***.

\*        \*        \*

The ***supply chain issues*** are only being driven by 2 factors.  The one factor is, obviously, the ***excessive complexity on our own product portfolio***, which adds some vulnerability to our supply chain.

129.    Defendant Chapman also revealed that Diebold had been "adversely impacted by higher shipping costs from expedited freight in order to mitigate supply chain delays and meet our customer delivery schedules."

130.    An analyst with D.A. Davidson & Co. grilled Schmid on the "disturbing" admission that Diebold's service organization was "***riddled with inefficiency***," and asked "***[w]here is the accountability*** there for the 600-or-so basis points of margin compression you've seen since the merger?"  In response, Schmid explained that the ***"fundamental reason" for the Company's poor post-merger results was "the complexity of our operating model***."

131.    In response to another analyst question, Schmid admitted that the "majority" of the $90 million goodwill impairment charge was associated with the Wincor Nixdorf merger and conceded that Wincor Nixdorf was still not fully integrated, despite Defendants' prior false and misleading statements to the contrary.  Rather, Schmid characterized the Company as in the midst of a "journey to integrate."

132.    On this news, the price of Diebold stock fell a staggering 38% to $7.05 per share by market close on August 1, 2018, on abnormally high volume of over 11 million shares traded, and continued its freefall as the market digested the truth and Diebold's business and operations.

- 66 -

133.    The price of Diebold common stock continued to decline over the next several days as problems continued to spill into the open and the market digested the gravity of the Company's revelations, the true state of Diebold's business and operating performance, and the consequences of Defendants' fraud.

134.    The Canton, Ohio-based *The Repository* reported on August 2, 2018, about the launch of "DN Now" in the wake of "a disappointing second quarter that ended with a $138.5 million loss":

> The new program, branded as DN Now, is designed to eliminate $200 million in costs by late next year.  Half of the cuts will come from efforts to streamline the company's operating model, while the remainder will involve selling non-core businesses, simplifying the company's automatic teller machine product line and other moves.
>
> The company also announced that because of the revised financial outlook it is talking with its principal lenders to amend its credit agreement.

135.    On Monday, August 6, 2018, Diebold filed its SEC Form 10-Q, which repeated the Company's shocking financial results and outlook.  The Form 10-Q also revealed that, following the Company's August 1, 2018, disclosures, $140 million of the redeemable non-controlling legacy shares had already been put to the Company.

136.    That same day, in response to the disclosures in Diebold's Form 10-Q, JP Morgan downgraded Diebold to Underweight from Neutral, citing the potential "liquidity crisis" facing the Company, the potential for a negative credit event, and because Diebold's "[c]ompetitive position may weaken . . . given that customers are likely to be hesitant to enter into long-term contracts with suppliers whose credit status is in question."  JP Morgan further opined that Diebold stock was still trading at unattractive levels "given the risks associated with a potentially adverse credit event in coming months" and "a multi-year integration process that continues to spawn restructuring programs and one-time charges."

4813-7945-3360.v4

137.    In response to the additional revelations, Diebold's stock price dropped an additional 10% on the day, falling to close at $6.30 per share.

138.    On August 8, 2018, the *Plain Dealer* published an article titled "ATM Maker Diebold Nixdorf having trouble with cash flow Manufacturing." The article discussed how Diebold's recent revelations had caused the price of the Company's securities to plunge, reporting:

> *If only Diebold Nixdorf could draw on the ATMs it manufactures to stave off what some analysts see as a potential liquidity crisis*.

> The company has to buy $160 million worth of shares of the company formerly known as Wincor Nixdorf, the German rival that Diebold bought most of in a 2016 takeover. North Canton-based Diebold said in a filing Monday that it was using cash and tapping its revolving credit line to buy back the shares, sending its bonds to record lows.

> The revolver drawdown comes just after Diebold reported an unexpected second-quarter loss, slashed annual guidance, and said it's talking to lenders about amending its credit agreement as a result. All of this has resulted in a more than 20-cent plunge in its 8.5 percent bonds over the past week.

> The situation may get worse: There are about another $280 million of Wincor Nixdorf shares that Diebold could have to buy back, an event that would potentially "force a liquidity crisis," JPMorgan Chase analyst Paul Coster said in a note Monday. The most obvious solution to that crisis – selling more stock – would dilute current shareholders, Coster wrote as he downgraded the stock to underweight from neutral.

> If the company relied on debt to finance its share buybacks, and assuming an adjusted measure of its earnings was at the low end of management's full year guidance of $280 million, its net debt would rise to around 7 times earnings before interest, taxes, depreciation and amortization.

> Diebold is trying to negotiate easier terms with its lenders, the second change in four months, to allow for greater leverage in its debt covenants. Right now, it is permitted to have net debt equal to 4.75 times adjusted earnings before interest, taxes, depreciation and amortization (EBITDA). It is not clear if this adjusted EBITDA figure is directly comparable with the one the company gave in its results. The company expects to violate that test at the end of the third quarter of this year.

139.    Then, on August 10, 2018, *The Motley Fool* reported on the continued slide in Diebold shares following the Company's August 1, 2018, reporting:

**Diebold keeps diving**

Diebold Nixdorf stock fell another 17%, bringing its losses over the past three days to more than 35%.  The automated teller machine specialist had to reduce its guidance for the full 2018 year after reporting a surprise loss for the second quarter, as costs ballooned for the company.  ***Problems have gotten bad enough that Diebold has chosen to take steps to negotiate with its creditors in an attempt to modify its credit agreement***.  With interest rates on the rise, now isn't the time to have trouble with your primary source of capital, and until Diebold can get its ATM business turned around and find other avenues for future growth, investors will be nervous about what's coming next for the company.

140.    All told, in little more than three months Diebold's stock price dropped over 70%, from $15.40 on the day before it began revealing portions of the truth on May 2, 2018, losing hundreds of millions of dollars in market capitalization.

141.    In the months that followed, the price of Diebold securities continued its downward spiral as the Company's problems continued to spill out into the open.  The shock of Diebold's poor performance had prompted the redemption of approximately $255 million of non-controlling shares by Wincor Nixdorf shareholders, triggering the feared liquidity crisis which forced the Company to renegotiate increased debt covenants with its lenders and seek emergency financing of $650 million.

142.    Diebold took additional impairments related to the Wincor Nixdorf merger in the third quarter, and a related adjustment in the fourth quarter of 2018, leading to total goodwill impairment for the year of over $217 million, almost $200 million of which was related to the merger.

143.    On October 1, 2018, in the midst of the impairment charges and Diebold's liquidity crisis, defendant Chapman abruptly left the Company "to pursue other opportunities."

144.    By December 2018, the price of Diebold stock had fallen to less than $3 per share, a drop of more than ***90%*** below its Class Period high.

4813-7945-3360.v4

145.    Ultimately, on March 1, 2019, the Company admitted that (a) it lacked adequate internal controls, (b) its deficient controls as of December 2018 were even "enhanced" compared to the deficient controls that existed at the beginning of 2018, (c) it was "still considering the full extent of the procedures to implement in order to remediate these material weaknesses," and (d) it could "give no assurances that any additional material weakness will not arise in the future due to its failure to implement and maintain adequate internal control over financial reporting.":

> Management identified control deficiencies as of December 31, 2018 that constituted material weaknesses. ***Throughout 2018, the Company enhanced***, and will continue to enhance, its internal controls over financial reporting. ***The Company had ineffective information technology general controls (ITGCs) used for financial reporting by certain entities throughout the organization, ineffective implementation and operation of controls over inventory valuation*** and ineffective controls over non-routine transactions.

> *          *          *

> • The Company had ***ineffective ITGCs related to IT systems*** used for financial reporting by certain entities ***throughout the organization***.  The Company did not establish effective IT and financial user access controls commensurate with certain job responsibilities.  Consequently, automated and manual process level controls over financial reporting which were dependent upon these ITGCs were also ineffective.

> • The Company had ineffective implementation and operation of controls over inventory valuation related to spare parts and finished goods from canceled orders as the Company did not effectively communicate information to certain locations to allow for the effective operations or implementation of these controls.

> • The Company had ineffective controls over non-routine transactions as certain controls were not designed at the appropriate level of precision to ensure calculations supporting non-routine transaction were calculated correctly.

> A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

> These control deficiencies resulted in misstatements to goodwill impairment, inventory and redeemable non-controlling interests all of which were corrected prior to issuance of the Company's consolidated financial statements as of and for the year ended December 31, 2018 included in this annual report on Form 10-K.  As these

deficiencies created a reasonable possibility that a material misstatement would not be prevented or detected in a timely basis, management concluded that the control deficiencies represent material weaknesses and accordingly our internal control over financial reporting was not effective as of December 31, 2018.

146.    Recently, on October 29, 2019, the Company disclosed that, as of September 30, 2019, *these material weaknesses still had not been remediated*.  Because of the material weaknesses in internal control over financial reporting, which were first identified by the Company in 2018, "a reasonable possibility exists that a material misstatement in the Company's condensed consolidated financial statements will not be prevented or detected on a timely basis."

147.    As a result of Defendants' wrongful acts and omissions, Plaintiff and the Class (defined below) purchased Diebold securities at artificially inflated prices, suffered significant losses and were damaged thereby.

## ADDITIONAL INDICIA OF DEFENDANTS' SCIENTER

148.    Throughout the Class Period, Defendants knew, or recklessly disregarded, the true facts about the merger and integration of Diebold with Wincor Nixdorf, including that the integration was riddled with debilitating inefficiencies and the cost synergies were targeted and achieved at the expense of operating and sales performance.

149.    As alleged herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and actions intended to manipulate the market price of Diebold common stock as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Diebold, their control over, and/or receipt or modification of

Diebold's allegedly materially misleading misstatements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Diebold, participated in the fraudulent scheme alleged herein.

150.    The adverse developments at issue also impacted the Company's most important revenue streams and derived from the Company's most important business relationships.  The Wincor Nixdorf acquisition was the most important acquisition in the Company's history and was hailed as transformative.  The Individual Defendants were personally involved in the integration efforts and in reporting the progress of those efforts to investors, and the Individual Defendants repeatedly held themselves out to investors as the employees most knowledgeable on these topics, assuring investors that they had significant visibility into the Company's integration progress and timeline.  For example, defendant Mattes assured investors that Defendants were integrating the companies with "*eyes wide opened*," and defendant Wunram stated his confidence in the integration activities explaining: "*[W]e are not naïve . . . we are aware of the risks*."  ¶¶59, 63.  As such, the Individual Defendants knew or were reckless in not knowing of the undisclosed facts detailed herein. These Defendants also had the motive and opportunity to commit the fraud.  For example, in conference calls with investors, they regularly highlighted bonus compensation tied to integration targets and the acceleration of integration goals as exceedingly strong motivating factors.  The exit of each of the Individual Defendants during or soon after the Class Period – at critical moments – also supports a compelling inference of scienter.

**Defendants Were Intimately Knowledgeable About the
Integration and Merger Synergies, and in Control of the
Business Prospects and Sales Efforts as Integration Proceeded**

151.    Defendants Mattes, Wunram and Chapman, all of whom were members of the Integration Committee established pursuant to the November 23, 2015 Merger Agreement, held

- 72 -

themselves out as knowledgeable about the progress of the Company's merger synergies and then-current state of the integration.  ¶¶44-46.  As members of the Integration Committee, each Individual Defendant was intimately involved in the planning process to integrate Diebold and Wincor Nixdorf. Due to their positions on the Integration Committee, and "a lot of meetings" regarding integration, each of the Individual Defendants also had detailed knowledge of the complexities which led to the failure to successfully integrate the companies and realize the purported synergies.  *E.g.*, ¶64. Despite this knowledge, each of the Individual Defendants falsely touted the success of the merger, including the promised synergies and the Company's resulting ability to "maintain our profitability and free cash flow targets."  *E.g.*, ¶72.  And as explained below, the Individual Defendants were incentivized to closely monitor the progress of the integration and merger synergies because portions of their incentive compensation was tied to realizing those touted targets.  For example, Mattes himself confirmed that the integration was "*under my leadership*."  ¶78.  Wunram served as Diebold's Chief Integration Officer and during the February 28, 2017 Investor Day, he explained that "*for the last year, I was heavily involved in getting the integration planning done*."  ¶46.  And Wunram leveraged his experience to assure investors: "*We are not naïve*.  I think *all of us have in one or the other way been in similar situations*, in M&A situations and in merger or integration activities.  So, *we are aware of the risks*."  ¶63.  Similarly, defendant Chapman assured investors early in the Class Period that the Company was "*working very diligently on integration activities and driving cost synergies*" and the "cost benefits will flow more substantially through the P&L as we progress in the year."  ¶51.  Chapman later repeated that "very good progress" was being made on integration and indicated that it was "organized, and the foundation work is in place."  ¶53.

152.    Additionally, as Defendants told investors that the integration was proceeding ahead of schedule and Defendants were increasing cost savings, the Individual Defendants assured

- 73 -

investors that they were also "making sure that we drive operational excellence."  ¶60.  Indeed, entering the Class Period, defendant Mattes told investors that recent integration-related sales issues had been taken care of and were "in the rearview mirror."  ¶96.  And the Individual Defendants, by virtue of the tools they told investors gave them visibility into the status of merger synergies and integration efforts, closely "measure[d] the total synergies realized" and gave Defendants a "pre-indicator" or "early view on where we have to intervene."  ¶64.

(a)      *Deal Review Process* (¶¶63-64).  As explained by defendant Wunram during the February 28, 2017 Investor Day Conference, the Deal Review Process, which by that time had been "***effective already since couple of months now***," was used to ensure that in the midst of the DN2020 program, the Company was "***protecting . . . baseline sales***."  As Wunram explained, the Deal Review Process had been providing "very good feedback.  We have a lot of sales team work on how to combine hardware sales with software, professional service and managed service sales.  We see a lot of such deals, which are really very positive for us but also provide a lot of value to our customers."  And during the planning and integration, Wunram explained that "needless to say that we have to do a lot of communication internally with sales teams and with the management teams."

(b)      *Degree of Implementation* (¶64).  Defendants also tracked the "Degree of Implementation" status that "measure[d] the total synergies realized" and was "a ***pre-indicator*** how far are we with detailing and making the action programs mature.  That gives us, so to say, an early view on where we have to intervene if things are not quick enough."  It is "***an early indicator also for intervention if things are not on the right track***."

(c)      Defendant Mattes confirmed the way they track the synergies and ensure that they have a tangible effect on the Company's bottom line: "***We track all of these synergies.  We***

- 74 -

*have a wave tool in which every one of the ideas that we go after is being tracked, from origination to becoming tangible until it shows up on our bottom line*." ¶81.

(d)     And in touting the integration of the sales teams and the resulting "sales excellence across the whole system," Mattes explained that "come April, the whole company is going to be on one sales management tool, *we're using Salesforce all around the globe*, *so we know exactly who's doing what, where*.  Is our sales team truly embracing the broadened portfolio of the company that we have?  But more importantly, *since January, everybody is on the same goal sheets*." ¶61.

**The Fraud Alleged Herein Relates to Diebold's Core Business**

153.    Defendants held high-ranking positions, as described in ¶¶44-47, and made numerous Class Period statements on the topic of Diebold's merger with Wincor Nixdorf, including Defendants' ability to, and success in, implementing cost improvements, achieving merger synergies, integrating the companies' sales teams and IT systems, and achieving efficiencies therein. The fraud alleged herein concerns Diebold's ability to successfully execute the merger and integration of Diebold and Wincor Nixdorf, which was viewed as a means to stave off the threat posed by cashless transactions, and increase margins by transitioning to a more profitable services-led revenue model, by creating the largest ATM manufacturer in the world with a dominant market share of over 30%.  As defendant Mattes described the deal, "by leveraging innovative solutions and talent from both organizations we will have the scale, strength and flexibility to help our customers through their own business transformation" and create a new global powerhouse "well positioned for growth in high-value services and software . . . across a broader customer base." ¶6.  According to Mattes, the two companies "fit extremely well together . . . nearly like two pieces of a jigsaw puzzle."    ¶7.   Demonstrating the core nature of the integration efforts, and the Individual

Defendants' involvement in and knowledge thereof, is the frequency and extent to which defendants Mattes, Chapman and Wunram spoke on the topic. *See, e.g.*, ¶78.  Given the core nature of the integration efforts and the Individual Defendants' frequent assurance of their personal involvement in those activities and the resulting impact those activities were having on the Company, knowledge of the fraud may be imputed to Defendants.

**The Abandonment of Diebold's DN2020 Program**
**and Subsequent Write-Down of Approximately $200**
**Million in Merger-Related Goodwill Evidences**
**Defendants' Knowing or Reckless Misconduct**

154.    Throughout the Class Period, Defendants repeatedly assured investors that Diebold was on track, or ahead of track, in integrating the two companies and realizing merger synergies.

155.    On December 13, 2017, defendant Mattes was forced to step down as CEO, effective immediately, with the Company confirming that Mattes had been asked to leave due to Diebold's poor financial performance following the merger with Wincor Nixdorf, based on Mattes's "executi[on of] our strategy, driving results, and delivering value for our stakeholders."  ¶108.

156.    Then, on August 1, 2018, Diebold announced that it had abandoned the DN2020 integration plan, and had launched a new cost-cutting integration program, branded as "DN Now," which was aimed at streamlining the Company's operating model, selling non-core businesses to improve the Company's abysmal capital structure, and reduce complexity in and simplify the Company's product line – all of the things Defendants told investors that DN2020 was doing. ¶¶29, 134.  At the same time, the Company revealed a $90 million goodwill impairment, the majority of which was merger-related.  ¶127.

157.    On October 1, 2018, the Company announced that defendant Chapman had left the Company "to pursue other opportunities."  ¶143.  Chapman's abrupt departure came less than a month before Diebold disclosed that it was required to take ***an additional impairments of more than***

***$109 million related to the Wincor Nixdorf merger*** in the third quarter and a related upward

adjustment in the fourth quarter of 2018, leading to total goodwill impairment for the year of over

$217 million, almost $200 million of which was related to the merger.

**Defendants' Fraudulent Conduct Allowed Them to
Retain Their Executive Positions and Collect Millions
in Compensation and Bonus Awards**

158.    The Individual Defendants were motivated to make the alleged false and misleading

statements in order to preserve their executive positions and personally collect millions of dollars in

compensation and bonuses.   And a significant portion of the Individual Defendants' annual

compensation was "at risk" as it is based on Company and/or individual performance.  This provides

significantly more upside potential and downside risk for more senior positions because these

executives have a greater influence on performance as a whole.

159.    As an example, for 2016, 86% and 70% of defendants Mattes's and Chapman's target

annual  compensation  was  "at  risk,"  respectively,  *i.e.*,  based  on  the  Company's  and  or  the

individual's performance.  For instance, in 2017, the year in which Mattes was terminated for poor

financial performance "based on executing [the Company's] strategy, driving results and delivering

value for our stakeholders," he received a base salary of $963,382 and over $5.1 million in incentive-

based "at risk" stock and options awards.[5]  Defendant Chapman, with a base salary of $574,178,

received  over  $2  million  650,000  in  incentive-based  stock  and  options  awards  in  2017,  and

defendant Wunram received $598,446 in salary and $1.9 million in incentive-based stock and

options awards.

---

[5]    Not included in this amount is the $5,775,475 in severance-related compensation Mattes
received.  *See* 2017 Proxy Statement at 65.

160.   And with respect to the merger synergies and integration efforts, 50% of Mattes's performance compensation in the form of stock options was based on total shareholder return and 50% was based on synergy metrics, including the level of achievement of synergy savings, including realized cost reductions, and the elimination of cost and scale efficiencies.  Similarly, defendants Chapman and Wunram participated in the Company's Performance-Based Synergy Grant program, implemented to "incentivize the accelerated achievement of cost reductions and scale efficiencies," and material portions of their incentive compensation was tied to achieving integration and cost savings targets.  The importance of the performance compensation to the Individual Defendants was acknowledged by defendant Mattes, who confirmed that Diebold "structured the compensation to incentivize overachievement."

**Defendants Mattes's, Chapman's and Wunram's Certifications**
**Pursuant to §302 of the Sarbanes-Oxley Act Further**
**Demonstrate They Acted with the Requisite Level of Scienter**

161.   In conjunction with Diebold's public financial statements filed with the SEC during the Class Period, defendants defendant Mattes, Chapman and Wunram issued certifications pursuant to §302 of the Sarbanes-Oxley Act, attesting that they reviewed the contents of the filings to confirm the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading," and that "the financial statements, and other financial information included in [each] report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in [each] report."  To assure each certification was not simply a hollow gesture, Mattes, Chapman and Wunram were required to and did further confirm that they were responsible for "establishing and maintaining [Diebold's] disclosure controls and procedures and [Diebold's] internal control over financial

reporting.'' Further, they had designed such controls to assure "the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with [GAAP]," and that material information relating to the Company's business was promptly made known to Diebold's senior executives, and had routinely evaluated the effectiveness of the Company's policies to assure that they and other executives were made aware of material information. Indeed, concurrent with their claims of personal knowledge and involvement in Diebold's business, operations and sales, and the synergy, integration and cost information available to Defendants throughout the Class Period, defendants Mattes, Chapman and Wunram publicly certified that they had personally "evaluated the effectiveness of [Diebold's] disclosure controls and procedures" and concluded that such procedures are effective. ¶¶56, 77, 95, 105, 117. At no time during the Class Period did Mattes, Chapman or Wunram assert that they were not aware of material aspects of Diebold's internal controls.

**There Is a Strong Inference that Diebold**
**Acted with the Requisite Scienter**

162.   Diebold's corporate liability derives from the actions of its agents. The allegations herein establish a strong inference that Diebold, as an entity, acted with corporate scienter throughout the Class Period, as its officers, management and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, because they failed to disclose the truth about Diebold's merger synergies and integration, including Diebold's inability to integrate the companies' sales forces and IT systems, and achieve cost targets without adversely affecting the Company's sales and supply chain, even though such facts were available to them. Taken collectively, these facts create a strong inference that Diebold acted with the requisite scienter.

163.    In addition to Diebold's liability as a result of the fraudulent actions of the Individual Defendants, the false and misleading statements alleged herein make clear that knowledge of the fraud went beyond the Individual Defendants.  Defendants repeatedly made clear that they had "two solid teams" driving the merger and integration planning, that "[t]he teams are working very diligently on integration activities and driving cost synergies, and "needless to say that we have to do a lot of communication internally with sales teams and with the management teams."

## LOSS CAUSATION/ECONOMIC LOSS

164.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Diebold common stock and operated as a fraud or deceit on purchasers of Diebold common stock by misrepresenting the Company's current and future business prospects.

165.    At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by Plaintiff and the other Class members.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Diebold's business, operations and financial condition, as alleged herein.  Throughout the Class Period, Defendants issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the price of Diebold common stock to be artificially inflated.  Plaintiff and other Class members purchased Diebold stock at those artificially inflated prices, causing them to suffer damages when the truth was revealed, as complained of herein.

166.    Following the disclosures of the truth about Diebold's business and operations, obfuscated by Defendants' false statements and omissions, on July 5, 2017, May 2, 2018 and August 1, 2018, Diebold common stock suffered material, statistically significant price declines as the prior

artificial inflation came out of the price of Diebold common stock.  The declines in the price of Diebold common stock following these disclosures were the direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.

167.    The price declines in the periods following the July 5, 2017, May 2, 2018 and August 1, 2018 disclosures removed the inflation from the price of Diebold common stock, causing real economic loss to investors who had purchased Diebold securities during the Class Period.  These drops and the resulting losses suffered by Class members were a direct result of the nature and impact of Defendants' prior false statements and material omissions being revealed to investors and the market.

168.    The timing and magnitude of Diebold's common stock price declines negate any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  Indeed, following the Company's surprise July 5, 2017 press release lowering its financial outlook for 2017 (discussed above at ¶¶85-86), Diebold common stock suffered a material, one-day price decline of more than 22.8%.  On the same day, the S&P 500 index remained basically flat, declining just 0.93%.  Following the May 2, 2018 disclosure (discussed above at ¶¶122-125), that Diebold had suspended its dividend in an attempt to improve its liquidity and debt position, failed to integrate Wincor Nixdorf as previously represented, admitted that it had been rendered too "complex" by the merger with and integration of Wincor Nixdorf, and that the merger had caused "additional complexity in [the] IT environment" and led to "supply chain" issues that had "adversely impacted the Company's operations," Diebold stock suffered a material, one-day price decline of more than 16%.  On the same day, the S&P 500 index basically remained relatively flat, recording a decline of just 0.22%.  And following the August 1, 2018 disclosure of the abandonment

of the DN2020 program and merger-related goodwill impairment charges (discussed above at ¶¶127-132), Diebold stock suffered a material, one-day price decline of more than 37%, the S&P 500 index remained flat, recording an increase of less than 0.5%.  Moreover, over the period August 1, 2018 through August 10, 2018, as the market digested the magnitude and consequences of the fraud and the true state of Diebold's business prospects and operations, the price of Diebold common stock dropped 43%, or $3.10 per share, closing at $3.95 on August 10, 2018.  The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Diebold common stock and the subsequent significant decline in the value of Diebold common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

169.    Accordingly, the economic loss, *i.e.*, damages, suffered by Plaintiff and other members of the Class, was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Diebold common stock and maintain the price at artificially inflated levels and the subsequent decline in the value of Diebold common stock when Defendants' prior misrepresentations and omissions were revealed.

## CLASS ACTION ALLEGATIONS

170.    Before, during and after the Class Period, Defendants regularly communicated with the public and investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

171.    As a result, the market for Diebold securities digested current information with respect to Diebold from publicly available sources and reflected such information in the price of

4813-7945-3360.v4

Diebold securities.  Under these circumstances, all purchasers or acquirers of Diebold securities during the Class Period suffered similar injury through their purchase of Diebold securities at artificially inflated prices and a presumption of reliance applies.

172.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all purchasers and acquirers of Diebold securities during the February 14, 2017 through August 1, 2018 Class Period who were damaged by Defendants' fraud (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

173.    Common questions of law and fact predominate and include: (a) whether Defendants violated the Exchange Act; (b) whether Defendants omitted and/or misrepresented material facts; (c) whether Defendants knew or recklessly disregarded that their statements were false; (d) whether the price of Diebold securities was artificially inflated during the Class Period; and (e) the extent of and appropriate measure of damages.

174.    The members of the Class are so numerous that joinder of all members is impracticable.  Upon information and belief, Diebold securities are held by hundreds or thousands of individuals located geographically throughout the country.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, as of February 23, 2018, there were over 75.9 million shares of Diebold common stock outstanding, which were actively traded on the NYSE throughout the Class Period.  Accordingly, Plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Diebold or its transfer

4813-7945-3360.v4

agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

175.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of the federal securities laws.

176.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

177.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable and prosecution of individual actions would create a risk of inconsistent adjudications.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

178.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine.  This presumption provides, *inter alia*:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's stock traded in an open efficient and well-developed market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Diebold securities; and

- 84 -

(e)     Plaintiff and other members of the Class purchased Diebold securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

179.    At all relevant times, the market for Diebold securities was efficient for the following reasons, among others:

(a)     Diebold stock met the requirements for listing, and was listed and actively traded, on the NYSE, a highly efficient and automated market;

(b)     according to the Company's 2017 Form 10-K, filed on February 28, 2018, the Company had over 75.9 million shares of stock outstanding as of February 23, 2018, demonstrating a very active and broad market for Diebold common stock during the Class Period;

(c)     as a regulated issuer, Diebold filed periodic public reports with the SEC;

(d)     Diebold common stock was regularly followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and customers of their respective brokerage firms;

(e)     Diebold regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(f)     unexpected material news about Diebold was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

180.    As a consequence, the market for Diebold securities promptly digested current information regarding Diebold from publicly available sources and reflected such information in the price of Diebold securities.  Under these circumstances, all purchasers of Diebold securities during

the Class Period suffered similar injury through their purchases of Diebold securities at artificially inflated prices, and a presumption of reliance applies.

181. A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the fraud claims asserted herein are grounded in Defendants' material omissions. As this action involves Defendants' failure to disclose material adverse information regarding Diebold's true business conditions – information Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions.

## NO SAFE HARBOR EXISTS FOR DEFENDANTS' STATEMENTS

182. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as forward-looking statements ("FLS") when made. To the extent there were any FLS, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly FLS. Alternatively, to the extent that the statutory safe harbor does apply to any FLS pleaded herein, Defendants are liable for those false FLS because at the time each of those FLS was made, the particular speaker knew that the particular FLS was false, or the FLS was authorized or approved by a Diebold executive officer who knew that those statements were false when made.

183. Defendants' "Safe Harbor" warnings accompanying Diebold's reportedly FLS issued during the Class Period were ineffective to shield those statements from liability. Because most of the false and misleading statements related to existing facts or conditions, the Safe Harbor has no

- 86 -

applicability.  To the extent that known trends should have been included in the Company's financial reports prepared in accordance with GAAP, they are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

184.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer and/or director of Diebold who knew that the FLS was false.  In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading.  Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide any meaningful disclosures of the relevant risks.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

185.     Plaintiff incorporates ¶¶1-184 by reference.

186.     During the Class Period, Diebold and defendants Mattes, Campbell and Wunram carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other members of the Class, regarding Diebold's business, operations, financial prospects and the intrinsic value of Diebold securities; (b) artificially inflate and maintain the market price of Diebold securities; and (c) cause Plaintiff and other members of the Class to purchase Diebold securities at artificially inflated prices and, as a result, suffer economic losses when the truth and impact about Defendants' fraud was revealed.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

187.    Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers or acquirors of Diebold securities in an effort to maintain artificially high market prices for Diebold securities in violation of §10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

188.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business and its operations as specified herein.

189.    These Defendants employed devices, schemes and artifices to defraud while in possession of material, adverse, non-public information, and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure investors of Diebold's value and performance and continued growth, which included the making of, or the participation in the making of, untrue statements of material fact and omitting to state material facts necessary in order to make the statements made about Diebold in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers or acquirors of Diebold securities during the Class Period.

190.    Each of defendants Mattes's, Chapman's and Wunram's primary liability, and controlling person liability, arises from the following facts: (a) these defendants were high-level executives and, in certain circumstances, directors at the Company during the Class Period and

- 88 -

members of the Company's senior management team; (b) each of these defendants, by virtue of his responsibilities and activities as a senior officer and director of the Company, was intimately familiar with and received the analysis concerning Diebold's cost reduction, synergy and integration efforts, as well as the Company's resulting integration difficulties and poor business results; (c) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's business and operations, at all relevant times; and (d) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading and omitted material information.

191.    In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X, 17 C.F.R. §210 *et seq*., and Regulation S-K, 17 C.F.R. §229.10 *et seq*., and other SEC regulations, including accurate and truthful information about the status of the Company's business and operations so that the market price of the Company's common stock would be based on truthful, complete and accurate information.

192.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  As such, Defendants' material misrepresentations and/or omissions were made knowingly or with a reckless disregard for the truth

and for the purpose and effect of material information about the Company's business and operations, thus supporting the artificially inflated prices of Diebold stock.

193.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Diebold securities was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Diebold securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the markets in which the securities trade and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Diebold securities during the Class Period at artificially inflated prices and were damaged when the artificial inflation came out of the stock.

194.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Diebold securities.  At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true and complete.  Had Plaintiff, the other members of the Class and the marketplace known the truth regarding the Diebold's merger integration issues and the true condition of Diebold's business operations and prospects, which were not disclosed by Defendants, they would not have purchased or otherwise acquired their Diebold securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

195.    By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

196.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Diebold securities during the Class Period.

## COUNT II

**For Violation of §20(a) of the Exchange Act**
**Against the Individual Defendants**

197.     Plaintiff incorporates ¶¶1-196 by reference.

198.     During the Class Period, the Individual Defendants acted as controlling persons of Diebold within the meaning of §20(a) of the Exchange Act.  By virtue of their executive and/or Board positions, stock ownership, and culpable participation, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and misleading as detailed herein.

199.     The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.  In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

200.     By reason of such wrongful conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

201.    As a direct and proximate result of these defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Diebold securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action, certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  January 10, 2020              KENDALL LAW GROUP, PLLC
                                      JOE KENDALL


                                            s/ JOE KENDALL
                                          JOE KENDALL

                                      3811 Turtle Creek Blvd., Suite 1450
                                      Dallas, TX  75219
                                      Telephone:  214/744-3000
                                      214/744-3015 (fax)
                                      jkendall@kendalllawgroup.com

4813-7945-3360.v4

DATED:  January 10, 2020       ROBBINS GELLER RUDMAN
           & DOWD LLP
         ARTHUR C. LEAHY
         BRIAN O. O'MARA
         SARA B. POLYCHRON

               s/ BRIAN O. O'MARA
              BRIAN O. O'MARA

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
artl@rgrdlaw.com
bomara@rgrdlaw.com
spolychron@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
CHAD JOHNSON
125 Park Avenue, 25th Floor
New York, NY  10017
Telephone:  212/791-0567
chadj@rgrdlaw.com

Lead Counsel for Lead Plaintiff

WRIGHT, SHAGLEY & LOWERY, P.C.
RICHARD J. SHAGLEY
RICHARD J. SHAGLEY, II
500 Ohio Street
Terre Haute, IN  47807
Telephone:  812/232-3388
rshagley@wslfirm.com
richards@wslfirm.com

Additional Counsel for Lead Plaintiff

- 93 -

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

INDIANA LABORERS PENSION AND WELFARE FUNDS ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.  Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

DIEBOLD

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 29 day of August, 2019.

INDIANA LABORERS PENSION AND
WELFARE FUNDS

By: _____

David A. Frye, Secretary-Treasurer

- 2 -

DIEBOLD

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Pension Fund**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 12/21/2017 | 21,340 | $17.38 |
| 12/22/2017 | 8,780 | $16.93 |
| 12/22/2017 | 12,900 | $16.93 |
| 12/28/2017 | 5,910 | $16.51 |
| 12/29/2017 | 5,670 | $16.49 |
| 05/02/2018 | 10,890 | $13.14 |
| 05/03/2018 | 6,080 | $12.09 |
| 05/23/2018 | 6,410 | $11.89 |
| 07/25/2018 | 6,950 | $10.94 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 08/01/2018 | 16,513 | $7.03 |

**Welfare Fund**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 12/21/2017 | 4,420 | $17.38 |
| 12/22/2017 | 1,820 | $16.93 |
| 12/22/2017 | 2,680 | $16.93 |
| 12/28/2017 | 1,220 | $16.51 |
| 12/29/2017 | 1,170 | $16.49 |
| 05/02/2018 | 2,290 | $13.14 |
| 05/03/2018 | 1,260 | $12.09 |
| 05/23/2018 | 1,330 | $11.89 |
| 07/25/2018 | 1,460 | $10.94 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 08/01/2018 | 3,430 | $7.03 |

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on January 10, 2020, I authorized the electronic

filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send

notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I

hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the

non-CM/ECF participants indicated on the attached Manual Notice List.

s/ BRIAN O. O'MARA
BRIAN O. O'MARA

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  bomara@rgrdlaw.com

4813-7945-3360.v4

# Mailing Information for a Case 1:19-cv-06180-LAP In re Diebold Nixdorf, Inc. Securities Litigation.

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **James E Arnold**
  jarnold@arnlaw.com,tashby@arnlaw.com

- **Ian Berg**
  iberg@aftlaw.com

- **Damion M Clifford**
  dclifford@arnlaw.com

- **Marjorie P. Duffy**
  mpduffy@jonesday.com

- **Lawrence P. Eagel**
  eagel@bespc.com,ecf@bespc.com

- **Virginia Ruth Hildreth**
  hildrethv@sullcrom.com,virgina-hildreth-3152@ecf.pacerpro.com,s&cmanagingclerk@sullcrom.com

- **William Scott Holleman**
  holleman@bespc.com,ecf@bespc.com

- **Joseph Alexander Hood , II**
  ahood@pomlaw.com,abarbosa@pomlaw.com

- **Christopher Chad Johnson**
  chadj@rgrdlaw.com,e_file_ny@rgrdlaw.com,chadj@ecf.courtdrive.com,e_file_sd@rgrdlaw.com,susanw@rgrdlaw.com

- **Elton Joe Kendall**
  administrator@kendalllawgroup.com,jkendall@kendalllawgroup.com

- **Arthur C. Leahy**
  artl@rgrdlaw.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,ahood@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Brian O. O'Mara**
  bomara@rgrdlaw.com

- **Sara Polychron**
  spolychron@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Lesley Frank Portnoy**
  LPortnoy@glancylaw.com,info@glancylaw.com,clinehan@glancylaw.com,charles-linehan-8383@ecf.pacerpro.com

- **David Maxwell Rein**
  reind@sullcrom.com,druckj@sullcrom.com,s&cmanagingclerk@sullcrom.com,david-mj-rein-2809@ecf.pacerpro.com,pierrej@sullcrom.com

- **Geoffrey Ritts**
  gjritts@jonesday.com,nmadamczyk@jonesday.com

- **Geoffrey J. Ritts**
  gjritts@jonesday.com,pgarver@jonesday.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com,drosenfeld@ecf.courtdrive.com

- **Jeffrey T. Scott**
  scottj@sullcrom.com,jeffrey-scott-6254@ecf.pacerpro.com,s&cmanagingclerk@sullcrom.com

- **Mitchell M.Z. Twersky**
  mtwersky@aftlaw.com,ahirsch@aftlaw.com

- **Nidhi Yadava**
  nyadava@jonesday.com,nydocket@jonesday.com,kmwaag@jonesday.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)